# EXHIBIT A

WILLIAM S. O'HARE (SBN 82562)
wohare@swlaw.com
ELIZABETH M. WELDON (SBN 223452)
eweldon@swlaw.com
SNELL & WILMER L.L.P.
600 Anton Blvd., Suite 1400
Costa Mesa, CA  92626
Telephone:  (714) 427-7000
Facsimile:   (714) 427-7799

ROBERT P. PARKER (*pro hac vice*)
rparker@rfem.com
MARTIN M. ZOLTICK (*pro hac vice*)
mzoltick@rfem.com
JENNY COLGATE (*pro hac vice*)
jcolgate@rfem.com
MICHAEL JONES (*pro hac vice*)
mjones@rfem.com
DANIEL R. MCCALLUM (*pro hac vice*)
dmccallum@rfem.com
MARK RAWLS (*pro hac vice*)
mrawls@rfem.com
D. LAWSON ALLEN (*pro hac vice*)
lallen@rfem.com
Rothwell, Figg, Ernst & Manbeck P.C.
607 14th Street N.W. – Suite 800
Washington, DC 20005
Telephone:  (202) 783-6040
Facsimile:  (202) 783-6031

Attorneys for Plaintiff Nichia Corporation

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICHIA CORPORATION,<br><br>Plaintiff<br><br>v.<br><br>FEIT ELECTRIC COMPANY, INC.,<br><br>Defendant. | Case No. 2:20-cv-00359-GW-E<br><br>**PLAINTIFF NICHIA CORPORATION'S FOURTH SUPPLEMENTAL RESPONSE TO DEFENDANT FEIT ELECTRIC COMPANY, INC.'S THIRD SET OF INTERROGATORIES (NOS. 12-20)**<br><br>Judge:  Hon. George H. Wu |

1

Pursuant to Federal Rules of Civil Procedure ("Federal Rules") 26 and 33, Plaintiff Nichia Corporation ("Nichia") hereby provides its fourth supplemental response to Defendant Feit Electric Company, Inc.'s ("Defendant's" or "Feit's") Third Set of Interrogatories (Nos. 12-20).

## INTRODUCTORY STATEMENT AND GENERAL OBJECTIONS

1.      Nichia incorporates its "Introductory Statement," and the "General Objections" from its previously served objections to Interrogatory Nos. 1-6 and Interrogatory Nos. 7-11.

2.      Nichia incorporates all of the foregoing General Objections into each of Nichia's responses to Defendant's Interrogatories, whether or not each such General Objection is expressly referred to in that specific response. Each of Nichia's Responses to the Interrogatories is expressly subject to, and without waiver of, these General Objections. By setting forth specific objections, Nichia does not intend to limit or supersede these General Objections. Where a partial answer can be made to an Interrogatory that is otherwise objectionable, such answer will be made without waiving any stated objection.

## NICHIA'S RESPONSES

**INTERROGATORY NO. 12:** Identify with specificity any element of an Asserted Claim of the '734 Patent that Nichia asserts is not taught or disclosed in the prior art or prior art combinations disclosed in Feit Electric's Final Invalidity Contentions[1] including the factual basis for Nichia's position and any corresponding support or evidence for Nichia's position.

---

[1] To the extent Nichia contends that this Interrogatory improperly consists of multiple subparts due to the number of references disclosed in Feit Electric's Final Infringement Contentions [sic], Feit Electric reserves its rights, but instructs Nichia to respond only as to *Mano* until such time as the parties can resolve this issue.

1    **Response**: In addition to the foregoing general objections, Nichia objects to
2    this Interrogatory to the extent it calls for information that is covered by the
3    attorney-client privilege, the work-product doctrine, or other immunity from
4    disclosure.  Nichia further objects to this Interrogatory to the extent it calls for
5    expert testimony.  Nichia will provide expert testimony on this subject in
6    accordance with Court's scheduling orders.

7         Subject to and without waiver of the foregoing general and specific
8    objections, Nichia responds that the '734 Patent was issued by the U.S. Patent and
9    Trademark Office and is presumed valid.  As a matter of law, it is Feit's burden to
10   establish the invalidity of the Asserted Claims, not Nichia's burden to establish that
11   they are not invalid.  In addition, the prior art identified in Defendant's Final
12   Invalidity Contentions, served April 23, 2021 (the "Contentions") fails to establish,
13   through invalidity charts or otherwise, that any piece of prior art anticipates or,
14   whether alone or in combination, would have rendered obvious any Asserted Claim
15   of the '734 Patent.  Specific examples are provided below.

16        The Contentions include a number of claim charts (Exhibits A-H)
17   purportedly demonstrating that some of the Asserted Claims are anticipated or
18   obvious.  As an initial matter, none of the cited references anticipates the Asserted
19   Claims at least because each of the cited references fails to disclose at least one
20   element of the Asserted Claims.  Further, none of the cited combinations of
21   references renders the Asserted Claims obvious at least because there is no
22   motivation to combine the references in the manner asserted, nor has Feit
23   articulated any expectation of success for the proposed combinations.  Indeed, Feit
24   suggests obviousness combinations without *any* specific analysis of the references.
25   *See, e.g.*, Ex. A, pp. 18-22.  Feit has the burden of establishing invalidity by a clear
26   preponderance of the evidence, but has failed to meet that burden.  The charts are
27   further deficient at least for the reasons stated below.

28

1    With regard to anticipation, the charts broadly assert that a reference
2    "directly or inherently, based on the presumed knowledge of a POSITA, discloses
3    each and every limitation of these claims."  E.g., Exhibit A, p. 1.  The charts are
4    deficient where they rely on inherency without providing a basis in fact and/or
5    technical reasoning to reasonably support a determination that the allegedly
6    inherent characteristic necessarily flows from the teachings of the applied prior art.
7    E.g., Exhibit A, p. 19 (wrongly asserting that Mano inherently discloses a YAG
8    group phosphor merely because "YAG phosphors were well known and commonly
9    used in the art"); Exhibit C, p. 6 (wrongly asserting that Ishibashi inherently
10   discloses element 1[c] because "[i]t was well known in the art that LEDs were
11   commonly packaged in a fluorescent, transparent resin, wherein the fluorescent
12   material converted wavelength.").  Nichia identifies specific examples below,
13   without waiving its general position that the charts fail to establish the inherent
14   disclosure of a claim element, or part of a claim element, by any of the references.
15   Further, where the charts rely on a reference inherently disclosing a claim element,
16   there is not an alternative allegation of obviousness based on the reference.
17   Notwithstanding Feit's failure to allege obviousness in these circumstances, the
18   charts provide no factual support or analysis to support a determination of
19   obviousness.

20   With regard to obviousness, the charts generally are deficient in providing
21   the factual bases or analysis required for an obviousness determination.  When a
22   motivation to combine is provided, it is usually boilerplate without the requisite
23   analysis.  This is clear, for example, where the different charts assert the same
24   motivations to combine different references despite underlying factual differences
25   with the references.  E.g., Exhibit G, p. 17 (noting in chart applying Maxik, the
26   same rationale as used with Ishibashi, and erroneously referring to Ishibashi:  "A
27   POSITA would have found the modification of Ishibashi with Suehiro '897
28   obvious, requiring simple substitution of known components, to produce

predictable results"); Exhibit C, pp. 11-12 (noting same in chart applying Ishibashi); *compare* Exhibit D, p. 13 *with* Exhibit G, p. 10 (same boilerplate motivation to combine Suehiro '897 with either Scianna or Maxik).  The lack of reasoned basis shows that the purported obviousness grounds are the product of hindsight and the '734 patent's disclosures, and not based on the knowledge of a POSITA at the time of filing.

The Contentions are further deficient for failure to consider—or even acknowledge—the Court's claim constructions when addressing anticipation or obviousness.  Because the Contentions do not apply the prior art to any claim element as construed, Feit has not shown that any such claim element is disclosed in the prior art.

To the extent that the same prior art reference is used in multiple charts, any comments about that reference with respect to one chart are incorporated into the other charts where that reference is used.  Additionally, specific comments to a particular chart are provided below by way of example only.

Further, the specific comments to a particular chart that are provided below are responsive to the points alleged in the Contentions.

Exhibit A

As an initial matter, U.S. Patent Publication Number 2004/0239242 ("Mano") was cited and specifically addressed by the Examiner during prosecution, and the claims were allowed.  All arguments that Nichia made distinguishing Mano during prosecution remain applicable here.

The chart alleges that claims 1, 3, 4, 6, 7, 11-15, 17-22, 24, 25, and 27 are anticipated by Mano.  Notwithstanding the allegation of anticipation, the chart improperly mixes different embodiments of Mano.  E.g., p. 4 (relying on figures from Mano's first and second embodiments); p. 9 (relying on figures from Mano's fifth embodiment).  This is improper at least because anticipation cannot be based on a combination of different embodiments or distinct teachings of a single

reference.  While obviousness of these claims over Mano is not alleged, Nichia further notes that there is no factual basis or analysis provided to support a determination of obviousness.

The chart further alleges that claims 6, 7, 11, 13, and 14 would be obvious over Mano in view of one of U.S. Patent No. 6,066,861 ("Hohn"), U.S. Patent No. 7,723,740 ("Takashima"), and European Publication No. 1116419B1 ("Debray").  It would not have been obvious to combine any one of Hohn, Takashima, and Debray with Mano, for example, due to the differences in subject matter, the different problems being solved, and the difficulty of modifying the references in the manner asserted without undue experimentation.  Feit provides no specific motivation to combine any these references with Mano, and similarly articulates no expectation of success.

With regard to specific elements, the chart is deficient for at least the following additional reasons.

At least for reasons explained during prosecution, Mano fails to disclose elements 1[h], 1[i], and 1[j].  For example, with respect to element 1[h], the lens 130 in Mano is not elongated in the longitudinal direction when viewed in plan view.  Further, the light emitting element chips in Mano are not arranged from the center of the board to one end or the other end of the board, as required by elements 1[i] and 1[j], at least because the chips are arranged transversely (or crosswise) on either side of the board's center and they are not arranged longitudinally from the center to an end of the board.  Mano also fails to disclose elements 1[d], 1[e], and 1[g].

In charting element 1[d], Feit relies on Mano.  First, in charting element 1[a], Feit relies on substrate 110 (referring to the second embodiment) as the board, but in charting element 1[d], Feit relies on board 10 (referring to the first embodiment).  This improperly mixes embodiments.  Second, the bulb 81 does not enclose the board 10 as disclosed in Mano.  This is apparent from FIG. 13, which shows that

1    the board 10 extends into the base 82.  Because the board 10 extends beyond the

2    bulb, the bulb 81 does not "enclose[] the board" as required by the claim element.

3         In charting element 1[e], Feit relies on Mano.  Feit cites to Mano's FIG. 10

4    and corresponding disclosure, but does not appear to rely on anode 23a and cathode

5    23b of this embodiment, and provides no allegations that either feature of Mano

6    discloses any element of the claims.  Nonetheless, FIG. 10 shows a packaged light

7    emitting element 20 having a light emitting diode 21 that correspond to what Feit

8    alleges are the light emitting elements required by element 1[b].  To the extent the

9    anode 23a and cathode 23b of the light emitting element 20 are alleged to be the

10   claimed support leads, this position is inconsistent with that taken with respect to

11   elements 1[g] and 1[k], as well as claim 4.  Further, anode 23a and cathode 23b do

12   not "secure the plurality of light emitting element chips inside the transparent bulb."

13   Rather than rely on the anode 23a and cathode 23b of FIG. 10, Feit relies on the

14   conductive pattern 50, including electrodes 50a and 50b, as the support leads.

15   Mano explains that the conductive pattern 50 is formed by plating, and is therefore

16   a thin layer of metal.  E.g., Mano [0075] ("This wiring pattern may have a two-

17   layer structure consisting of a lower layer made by Cu- or Ni-plating and an upper

18   layer made by Au-plating on the lower layer.").  The conductive pattern 50 as

19   disclosed in Mano does not offer support and in particular does not "secure the

20   plurality of light emitting element chips inside the transparent bulb."  Further, this

21   claim element ("support leads") is distinct from the claim element "metal plates,"

22   yet Feit appears to improperly conflate them, as well as to mix embodiments.  See

23   Exhibit A, pp. 7-9 (terminals 150 perform similar functions as conductive pattern

24   50 in Mano's various embodiments).

25        In charting element 1[g], Feit relies on Mano.  Specifically, Feit relies on

26   either conductors 140 or terminals 150, but such wiring patterns are not "metal

27   plates," and Mano does not disclose any metal plates that protrude from both ends

28   of the wavelength conversion member.  A thin film or copper foil cannot

1    reasonably be considered the claimed "metal plates." Feit cites to portions of Mano

2    that refer to wiring pattern 440 and terminals 450, that serve similar roles as

3    conductors 140 and terminals 150 in Mano's fifth embodiment. To the extent these

4    are alleged to be the metal plates, the same arguments also apply here.

5          With regard to claim 4, in addition to relying on elements in Mano that do

6    not correspond to the claimed metal plates and support leads, the elements that Feit

7    relies on here do not cross. That is, Feit is wrong that "the conductors 140 crosses

8    the support lead 150" (Exhibit A, p. 17), because element 140 does not extend from

9    one side of element 150 to the other as required by the Court's construction of the

10   phrase "crosses the support lead."

11         With regard to claim 12, the chart is further deficient. As shown in FIG. 22

12   of Mano, while the two sets 126 and 127 are each individually in series, the sets

13   themselves are connected in parallel. In charting element 1[b], Feit relies on light

14   emitting diode chips 21 in packaged light emitting element 20 to be the claimed

15   "plurality of light emitting element chips." In charting elements 1[i] and 1[j], Feit

16   further relies on the first element set 126 and second element set 127 as the sets of

17   light emitting element chips. Further, consistent with the Court's claim

18   construction, a set must be at least two chips. As shown in Mano, the sets 126 and

19   127 that Feit relies on are connected in parallel. Thus, this does not meet the claim

20   requirement that "the plurality of light emitting element chips" be connected in

21   series.

22         With regard to claim 17, the chart is further deficient. Mano teaches that

23   light can enter the board through an exposed part 161 and then pass through the side

24   surfaces 116. The surface of the board is otherwise covered with reflecting layer

25   (reflector) 160. There is no disclosure that the light forwards out through the

26   second surface of the board from an LED chip mounted on the first surface side.

27         With regard to claims 19, 22, and 25, the chart is further deficient. Mano

28   teaches that the four LED chips are radially arranged, not that they are aligned

1  along a line, and not along a line that extends in the longitudinal direction.  In

2  particular, Mano fails to teach that "all light emitting element chips mounted on the

3  first surface side of the board are aligned along a line," as required by claim 19.

4  Further, Mano fails to teach that "the first set of light emitting element chips and

5  the second set of light emitting element chips are aligned along substantially a

6  single line that extends in the longitudinal direction of the wavelength conversion

7  member," as required by claim 22.  Mano also fails to teach that "all of the light

8  emitting element chips mounted on the first surface side of the board are aligned

9  along a single line when viewed in plan view of the first surface side of the board,"

10  as required by claim 25.

11  Exhibit B

12      The chart alleges that claims 1, 3, 4, 6, 7, 11-15, 17-22, 24, 25, and 27 are

13  obvious over U.S. Patent Publication No. 2004/0008525 ("Shibata '525") with U.S.

14  Patent Publication No. 2004/0007980 ("Shibata '980").  It would not have been

15  obvious to combine Shibata '525 with Shibata '980.  For example, Shibata '525

16  discloses a structure for mounting a chained LED body within a traditionally

17  shaped lightbulb, while Shibata '980 discloses embodiments related to a tubular

18  fluorescent-style lightbulb.

19      The chart further alleges that claims 11, 13, and 14 would be obvious over

20  Shibata '525 in view of Shibata '980 and further in view of one of Hohn,

21  Takashima, and Debray.  It would not have been obvious to combine any one of

22  Hohn, Takashima, and Debray with Shibata '525 and Shibata '980, for example,

23  due to the differences in subject matter, the different problems being solved, and the

24  difficulty of modifying the references in the manner asserted without undue

25  experimentation.

26      With regard to the specific elements, the chart is deficient for at least the

27  following additional reasons.

28

1       In charting claim elements 1[a] and 1[b], Feit relies on Shibata '525.  The
2   LED chips in the LED chain body in both Shibata '525 and Shibata '980 are
3   connected together by multiple short pieces of metal plates, so that the chain bodies
4   can be flexible.  These multiple short pieces of metal plates do not constitute "a
5   board having end portions and a center portion therebetween" in the manner
6   claimed.

7       In charting claim element 1[c], Feit relies on Shibata '525 and Shibata '980,
8   but neither of these discloses a wavelength conversion member formed unitarily
9   with a transparent member that "seals the plurality of the light emitting element
10  chips."  Indeed, both Shibata references teach that the LED lamps 3 are composed
11  of LED chips that are embedded in transparent bodies.  See Shibata '525, ¶[0014];
12  Shibata '980, ¶[0015].

13      In charting claim element 1[g], Feit relies on Shibata '525 and Shibata '980.
14  Shibata '525 fails to disclose the metal plates, and the flexible members 4 that are
15  described do not meet the claim requirements.  First, these are the same elements
16  that Feit has identified as the alleged board, but the "board" and the "metal plates"
17  of the claim are distinct elements.  Second, the flexible members 4 are connected to
18  the bottom of LED lamps 3, they do not protrude from both ends of a wavelength
19  conversion member.  For Shibata '980, the pin 1b does not protrude from a
20  wavelength conversion member, it is instead part of base 1a which is separate from
21  the tube 1 whose inside surface may have a fluorescent material.  Further, there is
22  no reason why a POSITA would modify Shibata '525 to include pin 1b, at least
23  because there is no reason why tubular lamp 1 (in Shibata '980) would be placed
24  within a bulb 1a (in Shibata '525) or why (if it were) the lead-in wires 1d, anchors
25  1f, and hub 1e (in Shibata '525) would remain or be connected with the pin 1b.  The
26  Contentions fail to provide a factual basis for motivating the combination, or an
27  expectation of success if the references were combined as alleged.

28

1   In charting claim element 1[h], Feit relies on Shibata '980.  Neither Shibata
2   reference teaches that the wavelength conversion member is on both the first
3   surface side and second surface side of the board.  Furthermore, tube 1 in Shibata
4   '980 does not seal the plurality of LED chips, and a POSITA would not be
5   motivated to modify the fluorescent material on the tube 1 to be included on the
6   first surface side and second surface side of the board (allegedly the flexible
7   members 4).

8   In charting claim element 1[k], Feit relies on Shibata '525.  Feit has
9   identified both 1d and 1f as allegedly being the claimed support leads, but anchors
10  1f (which are described as providing support) do not provide electrical connection,
11  and wires 1d (which are described as providing electrical connection) do not
12  provide support.  The Contentions rely on FIG. 1 of Shibata '525.
13  Notwithstanding, FIG. 3 of Shibata '525 shows a different embodiment lacking
14  anchors 1f, and both embodiments of Shibata '525 describe the stem 1c as
15  providing support, not the wires 1d.  Accordingly, Shibata '525 fails to show this
16  element.

17  Exhibit C

18  The chart alleges that claims 1, 3, 4, 6, 7, 11-15, 17-22, 24, 25, and 27 are
19  anticipated by U.S. Patent Publication No. 2003/0031015 ("Ishibashi").  Ishibashi
20  fails to disclose each and every element of the claim.

21  The chart further alleges that claims 1, 4, 6, 7, 11, 13-15, 17, 18, 20-22, 24,
22  and 27 are obvious over Ishibashi in view of one of U.S. Patent No. 7,875,897 to
23  Suehiro ("Suehiro '897") and U.S. Patent Publication No. 2004/0257797 to Suehiro
24  ("Suehiro '797"), or Ishibashi in view of one of Suehiro '897 and Suehiro '797 and
25  further in view of one of Hohn, Takashima, and Debray.  Claims 3, 12, 19, and 25
26  are excluded from any obviousness allegation.

27  It would not have been obvious to combine any one of Suehiro '897 and
28  Suehiro '797 with Ishibashi.  For example, Ishibashi requires that the printed circuit

board 5 be flexible so that it can be bent into a cage-like shape.  However, the proposed combinations would incorporate the glass sealing member of the Suehiro references to act as a wavelength conversion member, defeating the purpose of Ishibashi's flexibility.  It further would not have been obvious to combine any one of Hohn, Takashima, and Debray with Ishibashi and one of Suehiro '897 and Suehiro '797, for example, due to the differences in subject matter, the different problems being solved, and the difficulty of modifying the references in the manner asserted without undue experimentation.  The Contentions contain no specific arguments regarding combining the Hohn, Takashima, or Debray references with any other.

Additionally, the Suehiro references contain numerous embodiments that cannot be freely mixed and for which the chart fails to provide a motivation for mixing.  While the chart points primarily to figures of single-LED-chip embodiments, citations are also provided to other embodiments without explanation.  By way of example, a POSITA would not have – and could not have – combined the sixth embodiment (as illustrated in FIGS. 11 and 12A) with the eleventh embodiment (as illustrated in FIG. 20[2]) of Suehiro '797.  There is no indication that the unique structure in the sixth embodiment could be, let alone should be, adapted for multiple LED chips, as needed for aspects of the eleventh embodiment.  Moreover, Feit has not demonstrated that the device structures for these embodiments are compatible.  For the sixth embodiment, a ceramic board 9 is used, which is in direct contact with a wavelength conversion portion 2 and without a reflection portion.  In contrast, the eleventh embodiment uses a base portion 104, reflection surface 130, and elevated sheet-glass member 121 setup, which is a fundamentally different and alternative approach.  The embodiments also use

---

[2] The embodiments described with respect to FIGS. 15, 16C-F, and 18-22 of Suehiro '797 are also multi-chip arrangements with a mounting setup that cannot be combined with the teachings related to FIGS. 11 and 12A.  Moreover, the embodiments described for FIGS. 15, 16C-F, and 18-22 have all the same deficiencies as those of FIG. 20.

1    different processing steps.  *Compare* FIGS. 12A-12C with FIGS. 16 and 17.  Other

2    portions of the Contentions draw from yet further embodiments, without support for

3    the proposed mixing and modifications.  Indeed, the mixing of unrelated

4    embodiments is not even acknowledged.

5         The various embodiments of the Suehiro references achieve different goals

6    through different mechanisms (e.g., varied mounting structures and processes), and

7    it would not have been obvious to mix and match them, nor would a POSITA have

8    had a reasonable expectation of success from mixing and matching them.  The

9    Contentions thus fail to provide a *prima facie* case of obviousness at least because

10   they do not provide the necessary analysis for combining teachings from different

11   embodiments of the same reference, let alone different embodiments of the

12   different Suehiro references.

13        With regard to the specific elements, the chart is deficient for at least the

14   following additional reasons.

15        In charting claim element 1[c], Feit relies on Ishibashi and alternatively on

16   Suehiro '897.  The chart points to LED chips 6 in Ishibashi being packaged on the

17   wiring pattern by soldering or the like.  This is not a disclosure of a wavelength

18   conversion member, and to the extent the packaging is capable of converting

19   wavelength (which Ishibashi does not disclose), it at most discloses individually

20   packaged LED chips, not a wavelength conversion member that "seals the plurality

21   of light emitting element chips."  The chart also relies on Suehiro '897 at FIG. 13,

22   which does not disclose a wavelength conversion member that "seals the plurality

23   of light emitting element chips."

24        In charting claim element 1[e], Feit relies on Ishibashi.  The chart relies on a

25   single supporting rod 3 to be the claimed "support leads," but a single member such

26   as supporting rod 3 cannot be the claimed "support leads."

27        In charting claim element 1[g], Feit relies on Ishibashi and alternatively on

28   Suehiro '897 and Suehiro '797.  At most, Feit alleges that Ishibishi would

13

"invariably include a conductive connecting means," but the claimed pair of metal plates protruding at both ends of the wavelength conversion member, for electrical connection with support leads, is not inherent in Ishibashi as there are other ways to provide electrical connection, and therefore Ishibashi cannot anticipate the claim. Both Suehiro'897 and Suehiro '797 require a rigid glass encapsulant.  However, Ishibashi requires a bendable "printed circuit board 5," pointing away from a pair of metal plates protruding at both ends of the wavelength conversion member. Further, the embodiments of the Suehiro references in the included figures only have a single LED chip, and the multiple-chip embodiments do not disclose a pair of metal plates protruding at both ends of the wavelength conversion member.  To the extent that the chart relies on wiring patterns (e.g., wire 19, Exhibit C, p. 11, wiring pattern 91, *id.*, p. 12), such wiring patterns are not metal plates.

In charting claim element 1[h], Feit relies on Ishibashi and alternatively on Suehiro '897 and Suehiro '797.  As noted, Ishibashi does not teach a wavelength conversion member, but even if the packaged LED chips 6 were regarded as having a wavelength conversion member, there is no disclosure that this wavelength conversion member would be on the first surface side and second surface side of the board or elongated in the longitudinal direction when viewed in plan view of the first surface side of the board.  Alternatively, the chart relies on Suehiro '897 or Suehiro '797.  As noted, Ishibashi teaches away from the solution of both Suehiro '897 and Suehiro '797.  Further, the relied-on FIG. 13 of Suehiro '897 does not show a plan view and it cannot be inferred from FIG. 13 that the wavelength conversion member is elongated in the longitudinal direction when viewed in plan view of the first surface side of the board.  As to Suehiro '797, the relied-on FIG.11 does not show a wavelength conversion member on both the first surface side and second surface side of the board.  Further, the embodiments of the Suehiro references in the included figures only have a single LED chip, and the multiple-chip embodiments do not disclose wherein the wavelength conversion member is

14

provided on the first surface side and the second surface side, the wavelength
conversion member is elongated in the longitudinal direction when viewed in plan
view of the first surface side of the board.

With regard to claim 4, Feit relies on Ishibashi and alternatively on Suehiro
'897 and Suehiro '797.  While Feit relied on an allegedly inherent disclosure in
Ishibashi of a pair of metal plates, nothing in Ishibashi teaches that any such alleged
metal plates crosses the support lead.  The alleged rationale for modifying Ishibashi
with Suehiro '897 or Suehiro '797 is nonsensical.  The alleged metal plates of the
Suehiro references are wiring patterns on a ceramic board or leads extending from a
single LED chip and the alleged support leads is the support rod 3 of Ishibashi.  A
POSITA would not have been motivated to make the wiring patterns or leads of the
Suehiro references extend from one side of the support rod 3 of Ishibashi to the
other.

With regard to claims 19, 22, and 25, the chart is further deficient.  Ishibashi
teaches that the LED chips are arranged on different belt-like branches 5a, not that
they are aligned along a line, and not along a line that extends in the longitudinal
direction.  In particular, Ishibashi fails to teach that "all light emitting element chips
mounted on the first surface side of the board are aligned along a line," as required
by claim 19.  Further, Ishibashi fails to teach that "the first set of light emitting
element chips and the second set of light emitting element chips are aligned along
substantially a single line that extends in the longitudinal direction of the
wavelength conversion member," as required by claim 22.  Ishibashi also fails to
teach that "all of the light emitting element chips mounted on the first surface side
of the board are aligned along a single line when viewed in plan view of the first
surface side of the board," as required by claim 25.

15

Exhibit D

The chart alleges that claims 1, 3, 4, 6, 7, 11-15, 17-22, 24, 25, and 27 are anticipated by U.S. Patent No. 6,568,834 ("Scianna"). Scianna fails to disclose each and every element of the claim.

The chart further alleges that claims 1, 4, 6, 7, 11, 13-15, 17-22, 24, 25, and 27 are obvious over Scianna in view of one of Suehiro '897 and Suehiro '797, or Scianna in view of one of Suehiro '897 and Suehiro '797 and further in view of one of Hohn, Takashima, and Debray. Claims 3 and 12 are excluded from any obviousness allegation.

It would not have been obvious to combine any one of Suehiro '897 and Suehiro '797 with Scianna. For example, neither Suehiro '897 nor Suehiro '797 teach that the LEDs are located within a lightbulb, and Scianna does not provide any details about how the LEDs are mounted or secured within the lightbulb. Further, as another example, some of the relied on embodiments in Suehiro '897 are disclosed with respect to backlighting applications. In general, a POSITA would not be motivated to take a lighting source for a backlighting application and mount or secure it within a lightbulb, and doing so would entail numerous design challenges beyond the ordinary skill. It further would not have been obvious to combine any one of Hohn, Takashima, and Debray with Scianna and one of Suehiro '897 and Suehiro '797, for example, due to the differences in subject matter, the different problems being solved, and the difficulty of modifying the references in the manner asserted without undue experimentation. The Contentions contain no specific arguments regarding combining the Hohn, Takashima, or Debray references with any other.

Further, both Suehiro '897 and Suehiro '797 disclose a number of different embodiments and, in the analysis disclosed in the claim chart, Feit selectively picks and chooses elements from different embodiments without explaining why a POSITA would have been motivated to make the modification.

16

1    With regard to the specific claim elements, the chart is deficient for at least
2    the following additional reasons.

3    In charting claim elements 1[a] and 1[b], Feit relies on Scianna, or
4    alternatively Suehiro '897 and Suehiro '797.  Sciana does not disclose a pluarlity of
5    LED chips mounted on a first surface side of the board.  The chart points to "the
6    radially outer surface" as the first surface side of the board.  As claimed the second
7    surface must be on an opposite side to the first surface, and there is not an opposite
8    side to the radially outer surface shown in Scianna.  Further, the first and second
9    region are part of the first surface, but there are not ends of the radially outer
10    surface shown in Scianna that the first and second regions extend to.

11    In charting claim elements 1[c] and 1[h], Feit relies on Scianna, or
12    alternatively Suehiro '897 and Suehiro '797.  Scianna's disclosure of "any type" of
13    LED does not disclose the claimed wavelength conversion member.  Further, there
14    is no embodiment in any one of Suehiro '897 and Suehiro '797 that teaches the
15    claimed wavelength conversion member.  Regarding Suehiro '897, the embodiment
16    of FIG. 13 does not teach a wavelength conversion member that "seals the plurality
17    of light emitting element chips" or that is "elongated in the longitudinal direction
18    when viewed in plan view of the first surface side of the board"; and the
19    embodiment of FIGS. 27A and 27B in addition to not teaching a wavelength
20    conversion member that "seals the plurality of light emitting element chips" also
21    does not teach a wavelength conversion member that is provided on both the first
22    surface side and the second surface side of the board.  Regarding Suehiro '797, the
23    embodiments of FIG. 11 and FIG. 20 do not teach a wavelength conversion
24    member that "seals the plurality of light emitting element chips," that is provided
25    on both the first surface side and the second surface side of the board, or that is
26    "elongated in the longitudinal direction when viewed in plan view of the first
27    surface side of the board."

28

In charting claim element 1[g], Feit relies on Scianna, or alternatively
Suehiro '897 and Suehiro '797.  Scianna does not expressly or inherently disclose
metal plates by its disclosure of wire or other suitable electrically conductive
material.  Moreover, Scianna does not disclose that the electrically conductive
material protrudes at both ends of the wavelength conversion member.
Furthermore, the chart conflates the distinct elements 1[g] and 1[h], as Feit has
contended that conductors 30 are both of these elements simultaneously.  Moreover,
and regarding Suehiro '797, a wiring pattern is not a pair of metal plates.

In charting claim elements 1[i] and 1[j], Feit relies on Scianna.  In particular,
Feit relies on the LED chips that are radially arranged as shown in FIG. 10.  These
chips are not arranged from the center of the board to one end or the other end of
the board at least because the chips are not arranged longitudinally from the center
to an end of the board.

With regard to claim 4, the chart alleges that Scianna discloses this based on
the same disclosure of the metal plates discussed in element 1[g].  But Feit has
pointed to the same conductors 30 as both the metal plates and the support lead, and
the conductors 30 do not cross themselves.  Further, the reliance on the Suehiro
references simply refers to it being obvious to supply electrical connection in the
manner claimed, which is deficient as a motivation to modify Scianna to meet the
claim element, and is further based on hindsight.

With regard to claim 17, Feit relies on Scianna and alternatively on Suehiro
'897 and Suehiro '797.  Scianna does not expressly or inherently disclose this
element by its disclosure of a surface where LEDs are mounted.  Moreover, Scianna
does not disclose the material composition or any other property of the mounting
surface, and given the radial arrangement of LEDs there is no reason why Scianna
would teach that "the board is configured to be transparent so that a light emitted
from the plurality of light emitting element chips on the first surface side of the
board forwards outside of the light emitting device through the second surface of

1    the board."  The alleged motivation for modifying Scianna with one of the Suehiro

2    references is also deficient.  Because Scianna allegedly has a bottom-facing LED,

3    the chart alleges that "emulating that emission most closely in the combination …

4    would be achieved by emitting light from the bottom of the optical element."  At

5    most, this alleges that the combination would teach claim 17, but does not explain

6    why a POSITA would be motivated to do so, i.e. why a POSITA would be

7    motivated to modify Scianna to emulate the emission of Scianna's alleged bottom-

8    facing LED.  The chart also lacks any factual basis for expectation of success

9    without undue experimentation.

10        With regard to claim 18, Feit relies on Scianna and alternatively on Suehiro

11    '897 and Suehiro '797.  Scianna does not expressly or inherently disclose this

12    element by its disclosure of using any type of LED.  Moreover, Scianna does not

13    disclose any wavelength conversion, much less teach that "the wavelength

14    conversion member is capable of converting light emitted from the plurality of light

15    emitting element chips into light with a different wavelength such that the

16    converted light with the different wavelength is radiated along a first direction from

17    the first surface side of the board to an outer periphery of the wavelength

18    conversion member, and along a second direction from the second surface of the

19    board to the outer periphery of the wavelength conversion member."

20        With regard to claims 19, 22, and 25, the chart is further deficient.  Scianna

21    teaches chips arranged radially, not aligned along a line, and further not along a line

22    that extends in the longitudinal direction.  The Suehiro references also do not teach

23    this element.  The single LED chip embodiments that are relied on for other claim

24    elements are not relevant here, and the multiple chip embodiments showing an

25    array configuration (as in FIG. 20 of Suehiro '797) does not teach chips aligned

26    along a line.  Further, the embodiment of FIGS. 27A and 27B of Suehiro '897 is

27    inconsistent with the other embodiments relied on, and the chart lacks a cogent

28    reason why a POSITA would modify Scianna based on this embodiment.

1    <u>Exhibit E</u>

2       The chart alleges that claims 1, 3, 4, 6, 7, 11-15, 17-22, 24, 25, and 27 are

3 anticipated by U.S. Patent No. 4,211,955 ("Ray").  Ray fails to disclose each and

4 every element of the claim.

5       The chart further alleges that claims 1, 4, 6, 7, 11, 13-15, 17-22, 24, 25, and

6 27 are obvious over Ray in view of one of Suehiro '897 and Suehiro '797, or Ray in

7 view of one of Suehiro '897 and Suehiro '797 and further in view of one of Hohn,

8 Takashima, and Debray.  Claims 3 and 12 are excluded from any obviousness

9 allegation.

10       It would not have been obvious to combine any one of Suehiro '897 and

11 Suehiro '797 with Ray.  For example, neither Suehiro '897 nor Suehiro '797 teach

12 that LEDs are located within a lightbulb, and Ray does not provide any details

13 about how an LED structure such as taught in one of Suehiro '897 and Suehiro '797

14 would be mounted.  It further would not have been obvious to combine any one of

15 Hohn, Takashima, and Debray with Ray and one of Suehiro '897 and Suehiro '797,

16 for example, due to the differences in subject matter, the different problems being

17 solved, and the difficulty of modifying the references in the manner asserted

18 without undue experimentation.  The Contentions contain no specific arguments

19 regarding combining the Hohn, Takashima, or Debray references with any other.

20       In charting element 1[a], Feit relies on Ray and alternatively on Suehiro '897

21 and Suehiro '797.  The alleged "infinite number of end portions" in Ray along a

22 circumference does not disclose "a board having end portions and a center portion

23 therebetween in a longitudinal direction."  Moreover, the Contentions assertion that

24 the board *could* be reconfigured is irrelevant to anticipation and insufficient

25 regarding obviousness.  No motivation is provided and the assertion is plainly

26 based on hindsight.

27       In charting element 1[c], Feit relies on Ray and alternatively on Suehiro '897

28 and Suehiro '797.  The chart relies on Ray's disclosure of LEDs 40, but a generic

1   disclosure of LEDs does not inherently disclose a wavelength conversion member

2   formed unitarily with a transparent member that seals the plurality of light emitting

3   element chips.  The Suehiro references cannot remedy this deficiency.  For

4   example, the embodiments of FIG. 1 (first embodiment) and FIG. 13 (thirteenth

5   embodiment) of Suehiro '897 and FIG. 3 (first embodiment), FIGS. 7-11 (second

6   through sixth embodiments), and FIGS. 15A-15B (ninth embodiment) of Suehiro

7   '797 involve a single LED and therefore do not teach a wavelength conversion

8   member that "seals the plurality of light emitting element chips."  The embodiment

9   of FIGS. 27A and 27B (twenty-seventh embodiment) of Suehiro '897 and FIGS.

10   19A-22 (tenth through thirteenth embodiments) are inconsistent with the other

11   embodiments, and inconsistent with Feit's application of elements 1[e], 1[g], and

12   1[k], and the chart also does not explain the factual bases or offer analysis for why

13   these embodiments or any other embodiment of the Suehiro references would be

14   combined with Ray in the manner alleged.  The purported motivations to combine

15   that are offered are boilerplate and lack sufficient factual underpinning.

16       In charting element 1[g], Feit relies on Ray and alternatively on Suehiro '897

17   and Suehiro '797.  The chart relies on Ray's disclosure of LEDs being "electrically

18   connected," but a generic disclosure of electrical connection does not inherently

19   disclose a pair of metal plates protruding at both ends of the wavelength conversion

20   member.  The Suehiro references cannot remedy this deficiency.

21       In charting element 1[h], Feit relies on Ray and alternatively on Suehiro '897

22   and Suehiro '797.  The chart alleges that Ray inherently discloses this element

23   based on general industry knowledge, but such knowledge does not inherently

24   disclose that "the wavelength conversion member is provided on the first surface

25   side and the second surface side, [and] the wavelength conversion member is

26   elongated in the longitudinal direction when viewed in plan view of the first surface

27   side of the board."  The Suehiro references also do not remedy this deficiency

28

In charting elements 1[i] and 1[j], Feit relies on Ray and alternatively on Suehiro '897 and Suehiro '797.  The first set is alleged to be the three LEDs on the left half of Ray's device.  While it is unclear what the second set is alleged to be (the chart merely says Ray "would also have included a second set"), Ray does not disclose a first/second set of the light emitting element chips are mounted on the first/second region and arranged from the center of the board to one/the other end of the board.  The relied-upon LEDs are arranged in a circle around the edge of the purported board.  The Suehiro references also do not remedy this deficiency.

For example, the 3x3 arrays of Suehiro '797 (*see* FIGs. 15A, 15B, 19A, 19B, and 20-22) do not disclose at least the following features of claim 1:

> *a board having end portions and a center portion therebetween, in a longitudinal direction*, the board having a first surface on a first surface side thereof and a second surface on a second surface side thereof, the second surface being an opposite side to the first surface, the first surface including *a first region and a second region, the first region extending from the center portion of the board to one of the end portions, the second region extending from the center portion of the board to the other of the end portions*;
>
> a plurality of light emitting element chips mounted on the first surface side of the board…
>
> wherein a first *set* of the light emitting element chips *are mounted on the first region and arranged <u>from</u> the center portion* of the board *to the one of the end portions*, [and]
>
> wherein a second *set* of the light emitting element chips *are mounted on the second region and arranged <u>from</u> the center portion* of the board *<u>to</u> the other one of the end portions*.

(Emphasis added).  That is, the claim requires two or more chips (*i.e.*, a set) on either side of the center.  Instead of what is claimed, the references (e.g., in the 3x3 arrays) show only single LEDs arranged on either side of the center.  To the extent that the Contentions assert that the disclosed devices could nonetheless be re-arranged or otherwise modified to meet the requirements of the claims, such an argument is pure hindsight.  Further, disclosing "another number of LED elements" does not disclose the arrangement of light emitting element chips that is claimed.

With regard to claim 4, the chart alleges that Ray discloses this based on the same inherent disclosure of the metal plates discussed in element 1[g].  But Ray

1    does not inherently disclose that each of the metal plates crosses the support lead.

2    The Suehiro references also do not remedy this deficiency.

3         With regard to claims 19, 22, and 25, the chart is further deficient.  Ray

4    teaches chips arranged radially, not aligned along a line, and further not along a line

5    that extends in the longitudinal direction.  The Suehiro references also do not

6    remedy this deficiency.

7    Exhibit F

8         The chart alleges that claims 1, 3, 4, 6, 7, 11-15, 17-22, 24, 25, and 27 are

9    anticipated by Japanese Publication No. 2000-277808 ("Okamoto").  Okamoto fails

10    to disclose each and every element of the claim.

11         The chart further alleges that claims 1, 3, 4, 6, 7, 11, 13, 14, 18, 24, and 27

12    are obvious over Okamoto in view of U.S. Patent No. 5,998,925 ("Shimizu").

13    Claims 12, 15, and 17, 19-22, and 25 are excluded from any obviousness allegation.

14         It would not have been obvious to combine Shimizu with Okamoto.  For

15    example, there would be no reason to replace the multi-color LED chips in

16    Okamoto with a blue chip-yellow phosphor combination, given Okamoto's use as a

17    signal light.

18         In charting claim element 1[c], Feit relies on Okamoto and alternatively

19    Shimizu.  The chart relies on Okamoto's disclosure of LED elements and industry

20    knowledge of fluorescent material.  This does not inherently disclose a wavelength

21    conversion member formed unitarily with a transparent member that seals the

22    plurality of light emitting element chips.  Further, while Shimizu teaches

23    wavelength conversion, it does not disclose a wavelength conversion member that

24    "seals the plurality of light emitting element chips."  Further, while the Contentions

25    cite the Suehiro references, there are no citations provided, obviousness is not

26    alleged in view of the Suehiro references, and no factual bases or analysis is

27    provided with respect to the Suehiro references.

28

1    In charting claim element 1[f], Feit relies on Okamoto.  Okamoto teaches a
2  lighting device for use as a signal light, for use as, for example, an advertisement
3  light, a signal for notifying a process abnormality in a factory or the like, or a signal
4  light for calling attention at a doorway of a parking lot, a construction site, or the
5  like.  This does not disclose, and the chart does not point to anything in Okamoto
6  disclosing, "a support base that can be threadedly engaged with a conventional light
7  bulb socket along a socket axis."

8    In charting claim element 1[g], Feit relies on Okamoto and alternatively
9  Shimizu.  The wiring pattern 6 shown in Okamoto are not metal plates, and there is
10  not a metal plate that protrudes from each end of the wavelength conversion
11  member, as required by the Court's claim construction.  Further, absent hindsight,
12  there would have been no reason to modify the design in Okamoto to include the
13  metal terminals 205 from Shimizu, which at any event do not protrude from the
14  wavelength conversion member taught in Shimizu.

15    In charting claim element 1[h], Feit relies on Okamoto.  First, Okamoto does
16  not show a wavelength conversion member, and second, as explained earlier, a
17  POSITA would not modify Okamoto with Shimizu in the manner claimed.
18  Additionally, the chart relies on FIG. 6, which does not show a plan view of a first
19  surface side of the board.  FIGS. 1 and 5, which do show such a plan view,
20  illustrate the resin 11 as being circular in shape in plan view, not elongated in a
21  longitudinal direction.  As it is resin 11 that the combination proposes to modify to
22  include phosphor and therefore become the wavelength conversion member, the
23  combination as proposed fails to show this element.

24    In charting claim elements 1[i] and 1[j], Feit relies on Okamoto.  In
25  particular, the chart relies on FIG. 11 of Okamoto, but FIG. 11 shows a prior art
26  device, not an embodiment of Okamoto.  Accordingly, Okamoto fails to teach the
27  element.

28

With regard to claim 3, the chart alleges that Okamoto discloses this based on the disclosure of "light translucent cover" 20.  But Okamoto does not inherently disclose that the cover is glass.

With regard to claim 4, the chart alleges that Okamoto discloses this based on the disclosure of "[t]he structure of a basic lightbulb."  But Okamoto does not inherently disclose that each of the metal plates crosses the support lead.

With regard to claims 19, 22, and 25, the chart is further deficient.  In charting element 1[j], Feit relies on Okamoto FIG. 11, which shows a grid or array like pattern of LED chips, not chips that are aligned along a line, and not along a line that extends in the longitudinal direction.  In particular, this figure in Okamoto fails to teach that "all light emitting element chips mounted on the first surface side of the board are aligned along a line," as required by claim 19.  Further, this figure in Okamoto fails to teach that "the first set of light emitting element chips and the second set of light emitting element chips are aligned along substantially a single line that extends in the longitudinal direction of the wavelength conversion member," as required by claim 22.  This figure in Okamoto also fails to teach that "all of the light emitting element chips mounted on the first surface side of the board are aligned along a single line when viewed in plan view of the first surface side of the board," as required by claim 25.

Exhibit G

The chart alleges that claims 1, 3, 4, 6, 7, 11-15, 17-22, 24, 25, and 27 are anticipated by U.S. Patent No. 7,086,756 ("Maxik").  Maxik fails to disclose each and every element of the claim.  (The chart erroneously cites to the patent publication of Ishibashi.  The Ishibashi reference is similar to Maxik, and relevant remarks regarding Ishibashi also apply here.)

The chart further alleges that claims 1, 4, 6, 7, 11, 13-15, 17, 18, 20-22, 24, and 27 are obvious over Maxik in view of one of Suehiro '897 and Suehiro '797, or Maxik in view of one of Suehiro '897 and Suehiro '797 and further in view of one

1  of Hohn, Takashima, and Debray.  The Contentions exclude claims 3, 12, 19, and
2  25 from any assertion of obviousness.

3      It would not have been obvious to combine any one of Suehiro '897 and
4  Suehiro '797 with Maxik.  For example, Maxik requires that the substrate 106 be
5  flexible so that it can be bent.  However, the proposed combination would
6  incorporate the glass sealing member of Suehiro to act as a wavelength conversion
7  member, defeating the purpose of Maxik's flexibility.  It further would not have
8  been obvious to combine any one of Hohn, Takashima, and Debray with Maxik and
9  one of Suehiro '897 and Suehiro '797, for example, due to the differences in subject
10  matter, the different problems being solved, and the difficulty of modifying the
11  references in the manner asserted without undue experimentation.

12      In charting element 1[c], Feit relies on Maxik or alternatively on Suehiro
13  '897 and Suehiro '797.  Maxik teaches using red, green, and blue LEDs to generate
14  white light, and does not teach using wavelength conversion.  Further, there is no
15  disclosure in Maxik of a wavelength conversion member that "seals the plurality of
16  light emitting element chips."  The Suehiro references cannot remedy this
17  deficiency.  For example, the embodiments of FIG. 1 (first embodiment) and FIG.
18  13 (thirteenth embodiment) of Suehiro '897 and FIG. 3 (first embodiment), FIGS.
19  7-11 (second through sixth embodiments), and FIGS. 15A-15B (ninth embodiment)
20  of Suehiro '797 involve a single LED and therefore do not teach a wavelength
21  conversion member that "seals the plurality of light emitting element chips."  The
22  embodiment of FIGS. 27A and 27B (twenty-seventh embodiment) of Suehiro '897
23  and FIGS. 19A-22 (tenth through thirteenth embodiments) are inconsistent with the
24  other embodiments, and inconsistent with Feit's application of elements 1[e], 1[g],
25  and 1[k], and the chart also does not explain the factual bases or offer analysis for
26  why these embodiments or any other embodiment of the Suehiro references would
27  be combined with Maxik in the manner alleged.  The purported motivations to
28  combine that are offered are boilerplate and lack sufficient factual underpinning.

In charting element 1[g] ("a pair of metal plates protruding at both ends of the wavelength conversion member"), Feit relies on Maxik or alternatively on Suehiro '897 and Suehiro '797. The chart relies on electrical connectors 112 of Maxik, but these are not located near the light emitting elements 110 and do not protrude at both ends of a wavelength conversion member. The chart further relies on what was allegedly well known in the art about electrical connectors, but this does not inherently disclose a pair of metal plates protruding at both ends of the wavelength conversion member. The chart does not allege that this element is obvious in view of Maxik, and at any event does not provide the factual bases or analysis necessary for an obvious determination. The Suehiro references cannot remedy this deficiency. The embodiments with multiple LED chips do not have metal plates that protrude from both ends of the wavelength conversion member (e.g., twenty-seventh embodiment of Suehiro '897). The embodiments with a single LED chip are inconsistent with how the chart applies other elements of the claim, such as elements 1[b], 1[c], and 1[h].

In charting element 1[h], Feit relies on Maxik or alternatively on Suehiro '897 and Suehiro '797. The chart relies on Maxik's disclosure regarding an omni-directional light source, but this is not an inherent disclosure of a wavelength conversion member that is provided on the first surface side and the second surface side, or that the wavelength conversion member is elongated in the longitudinal direction when viewed in plan view of the first surface side of the board. It appears that Feit does not even allege Maxik teaches a wavelength conversion member that is elongated in the longitudinal direction, and at any event the chart lacks any factual basis or analysis for supporting such an assertion. The Suehiro references cannot remedy this deficiency. The multiple LED chip embodiments of the Suehiro references do not have a wavelength conversion member on both sides of the board. The single LED chip embodiments do not show an elongated wavelength conversion member, and some of them also do not show a wavelength conversion

1    member on both sides of the board (e.g., as shown in FIGS. 9 and 11 of Suehiro

2    '797).  Feit further alleges that a POSITA would have understood the teaching

3    relating to glass sealing portion 6 in Suehiro '797 "to allow light to emit from the

4    bottom of the device, and as emphasizing that the wavelength conversion present on

5    the top face of the board also be implemented on the bottom of the board."  This is

6    wrong—the glass sealing portion 6 does not convert wavelength, and in fact

7    Suehiro '797 teaches the opposite, namely that light is reflected back upward to the

8    wavelength conversion portion 2 and away from the glass sealing portion 6.

9    Suehiro '797, ¶[0124] ("by providing the glass sealing portion 6 of whitish glass to

10   protect the bottom surface of lead frame 5, light heading from the LED element 3 to

11   the bottom side of light emitting device 1 can be reflected by the whitish glass and

12   radiated in the direction of wavelength conversion portion 2.")

13        In charting element 1[k], Feit relies on Maxik or alternatively on Suehiro

14   '897 and Suehiro '797.  Feit's position is unclear, but the chart seems to call both

15   electrical connectors 112 and support 114 as the claimed support leads.  E.g.,

16   Exhibit G, p. 14.  To the extent these are also alleged to be the claimed metal plate

17   this is improper as it conflates elements 1[e] and 1[g].  Further, the support 114

18   does not provide electrical connection to the electrical connectors 112, and

19   therefore, Maxik does not show that the relied-upon purported pair of metal plates

20   are electrically connected with the support base via the support leads, as required by

21   the claim.

22        With regard to claim 4, the chart alleges that Maxik discloses the features of

23   this claim.  As an initial matter, the number of cross-references and lack of

24   exposition make Feit's contention sufficiently unclear that it fails to allege

25   invalidity.  As best as can be determined, Feit is alleging that the electrical

26   conductors 112 (allegedly the metal plates) crosses the support 114 (allegedly the

27   support leads).  But there is no reason why each of the alleged metal plates crosses

28   the support lead, in the manner required by the Court's construction.  Further, the

1   electrical conductors 112 appear to extend in the same direction as the support 114

2   and do not cross each other.  The Suehiro references cannot remedy this deficiency.

3   Exhibit H

4        The chart alleges that claims 1, 3, 4, 6, 7, 11-15, 17-22, 24, 25, and 27 are

5   anticipated by Japanese Publication No. 2001-126515 ("Minato").  Minato fails to

6   disclose each and every element of the claim, either expressly or inherently.  The

7   Contentions do not provide any analysis relating to obviousness based on Minato.

8        As an initial matter, Minato is cited in the '734 Patent in the Description of

9   the Related Art section of the Background, and was considered by the USPTO as

10  evidenced by Minato appearing on the face of the patent.  In particular, JP Patent

11  Publication No. 3172947 is a granted patent of the patent application which was

12  laid open as JP 2001-126515A.  Any relevant remarks from the '734 Patent or the

13  prosecution where the USPTO allowed the claims over Minato are incorporated by

14  reference.

15       In charting element 1[c], Feit relies on Minato.  Specifically, the chart points

16  to LEDs encapsulated in a transparent resin, and then comments on general industry

17  knowledge of blue LEDs or wavelength conversion.  First, the disclosure relied on

18  in the chart does not inherently disclose wavelength conversion for at least the

19  reason that the resin of Minato does not necessarily convert wavelength.  Second,

20  Feit has made no allegations—let alone provided the factual underpinnings

21  regarding motivation to combine and expectation of success—necessary for an

22  obviousness argument or to otherwise rely on U.S. Patent No. 7,875,897 and U.S.

23  Patent Publication No. 2004/0257797, which are listed without specific citations.

24  Moreover, the Contentions do not even allege that all of the claimed features were

25  known in the art.  For instance, there is no allegation that "a single component that

26  both converts wavelength and allows light to pass through" was known.

27       In charting elements 1[d] and 1[f], Feit relies on Minato.  Specifically, the

28  chart points to Minato's purpose of providing a lighting device using an LED.  This

does not inherently disclose a transparent bulb that encloses the board and the
plurality of light emitting element chips.  It is improper to rely on combinations of
other references to establish anticipation under 35 U.S.C. § 102.  Moreover, with
respect to element 1[d], the Contentions do not even allege that all of the features of
the claim were known in the art.  For instance, the Contentions are silent regarding
a bulb that encloses a board, or that encloses "a plurality of light emitting
elements."  Additionally, Feit has made no allegations—let alone provided the
factual underpinnings regarding motivation to combine and expectation of
success—necessary for an obviousness argument or to otherwise rely on U.S.
Patent Application Publication No. 20030031015A1 and U.S. Patent No. 7,086,756,
which are listed without specific citations.

In charting elements 1[e] and 1[g], Feit relies on Minato.  The chart does not
specifically identify support leads or metal plates, and for this reason alone the
chart is deficient.  To the extent that Feit contends that the leads 32 and 33 are "a
pair of metal plates" (1[g]), Minato's device does not have support leads, and the
metal plates do not protrude at both ends of the wavelength conversion member.
To the extent that Feit contends that the leads 32 and 33 are "support leads" (1[e]),
Minato has no metal plates and does not disclose that the leads 32 and 33 "secure
the plurality of light emitting element chips inside the transparent bulb."

In general, the chart lists several patent publications in charting elements
1[c], 1[d], 1[e], 1[f], 1[g], claims 3, 6, 7, 14, and other elements and claims also
include these patent publications by cross-reference.  Feit has listed these patent
publications without specific citation and without allegations—let alone provided
the factual underpinnings regarding motivation to combine and expectation of
success—necessary for an obviousness argument or to otherwise rely on these
patent publications.

**INTERROGATORY NO. 13:** Identify with specificity any methodologies or tests
that Nichia asserts are applicable for determining whether a member is a

wavelength conversion member, a transparent member or a wavelength conversion member formed unitarily with a transparent member, including but not limited to the equipment needed for such analysis, the results that would provide the distinction and other necessary steps to allow for duplication or practice of such methodology or test, and identify any documents supporting Nichia's position.

**Response**: In addition to the foregoing general objections, Nichia objects to this Interrogatory to the extent it calls for information that is covered by the attorney-client privilege, the work-product doctrine, or other immunity from disclosure. Nichia further objects to this Interrogatory on the ground that it is vague and unclear. For example, "the results that would provide the distinction" is undefined and vague. Nichia interprets "the results that would provide the distinction" to mean results that would allow determination of whether a member is a wavelength conversion member, a transparent member, or a wavelength conversion member formed unitarily with a transparent member. Nichia further objects to this Interrogatory to the extent it calls for expert testimony. Nichia will provide expert testimony on this subject in accordance with Court's scheduling orders.

Nichia further objects to this Interrogatory on the grounds that it constitutes multiple subparts. It asks for (i) "any methodologies or tests," (ii) "equipment needed for such analysis," (iii) "the results that would provide the distinction," (iv) "other necessary steps to allow for duplication or practice of such methodology or test," and (v) "any documents supporting Nichia's position." Further, the Interrogatory asks each of these questions for methodologies or tests that are applicable for determining whether a member is (1) a wavelength conversion member, (2) a transparent member or (3) a wavelength conversion member formed unitarily with a transparent member. Accordingly, this Interrogatory counts as at least fifteen separate interrogatories.

Subject to and without waiver of the foregoing general and specific objections, Nichia responds as follows:

31

**(1) Wavelength conversion member**

Methodologies or tests that are applicable for determining whether a member is a wavelength conversion member include at least visual inspection of the member and the light output of the member; material analysis (e.g., Energy Dispersive X-Ray Spectroscopy (EDS) testing); and light spectroscopy. According to the Court's *Markman* order, "a wavelength conversion member" is "a component that converts wavelength." Visual inspection of the member can identify known wavelength conversion materials (e.g., phosphor) and/or whether the member converts wavelength (e.g., if blue light with a certain spectrum is converted to another (or different) color light with a different spectrum). Material analysis can identify known wavelength conversion materials (e.g., phosphor). Light spectroscopy can be used to determine whether the member converts wavelength (e.g., if blue light with a certain spectrum is converted to another (or different) color light with a different spectrum).

The equipment needed for such analysis may include any suitable equipment generally recognized in the industry for performing the specified methodology or test. In some instances, specialized equipment may not be necessary. For example, visual inspection may be performed by the human eye or with a digital camera. Equipment used for material analysis may include equipment capable of performing such analysis, e.g. an EDS machine or another machine with EDS capabilities (e.g., a scanning electron microscope (SEM)). Equipment needed for light spectroscopy may include spectrometers or other equipment incorporating spectral measurement components.

Duplication or practice of such methodologies or tests may be done generally by carrying out the methodologies or tests. For example, visual inspection of the member may include observation and digital photography (including with optical zoom) of the member and of cross-sections of the member. Visual inspection of the light output may include observation of the color of the light source with and

1   without the member.  Material analysis may include analyzing the member to detect

2   chemical composition.  Light spectroscopy may include determining a spectrum of

3   light output of the light source with and without the member.

4           **(2) Transparent member**

5           Methodologies or tests that are applicable for determining whether a member

6   is a transparent member include at least visual inspection of the member and the

7   light output of the member; material analysis (e.g., EDS testing); and light

8   spectroscopy.  According to the Court's *Markman* order, "a transparent member" is

9   a member that "allows light to pass through."  Visual inspection of the member can

10  identify known transparent materials (e.g., silicone) and can also be used to assess

11  whether the member allows light to pass through (e.g., if light is observed passing

12  through the member).  Material analysis can identify known transparent materials

13  (e.g., silicone).  Light spectroscopy can be used to determine that light from the

14  light emitting element chips (e.g., blue light) passes through the member.

15          The equipment needed for such analysis may include any suitable equipment

16  generally recognized in the industry for performing the specified methodology or

17  test, including equipment described above with respect to analysis of a wavelength

18  conversion member.

19          Duplication or practice of such methodologies or tests may be done generally

20  by carrying out the methodologies or tests.  For example, visual inspection of the

21  member may include observation and digital photography (including with optical

22  zoom) of the member and of cross-sections of the member.  Visual inspection of the

23  light output may include observation of the intensity of the light source with and

24  without the member.  Material analysis may include analyzing the member to detect

25  chemical composition.  Light spectroscopy may be measured to detect transmitted

26  light.

27          **(3) A wavelength conversion member formed unitarily with a**

28  **transparent member**

1    Methodologies or tests that are applicable for determining whether a member
2    is a wavelength conversion member formed unitarily with a transparent member
3    include at least the methodologies or tests identified above for determining (1)
4    whether a member is a wavelength conversion member and (2) whether a member
5    is a transparent member.  According to the Court's *Markman* order, "a wavelength
6    conversion member formed unitarily with a transparent member" is "a single
7    component that both converts wavelength and allows light to pass through."
8    Accordingly, if a member is both a wavelength conversion member ("a component
9    that converts wavelength") and a transparent member (a member that "allows light
10   to pass through"), then it is a wavelength conversion member formed unitarily with
11   a transparent member.

12      Nichia further states that its Final Infringement Contentions provide
13   exemplary results of methodologies or tests for determining whether a member is
14   (1) a wavelength conversion member, (2) a transparent member or (3) a wavelength
15   conversion member formed unitarily with a transparent member.  Additionally,
16   Nichia's testing of the Accused Products is ongoing and Nichia will supplement
17   this Interrogatory as appropriate.

18   **FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO.**
19   **13 (August 17, 2021):**

20      Pursuant to the Court's August 3, 2021 Order (Dkt. No. 178), Nichia
21   provides the following additional information.

22      A given member may (i) convert wavelength, (ii) allow light to pass through,
23   or (iii) both convert wavelength and allow light to pass through.  A member that
24   both converts wavelength and allows light to pass through meets the requirement
25   for the claimed "wavelength conversion member formed unitarily with a
26   transparent member," while a member that does only one of those things does not.

27      The patent-in-suit describes a resin–phosphor mixture as an example of the
28   claimed "wavelength conversion member formed unitarily with a transparent

1    member," and the Court agreed in the *Markman* order.  Specifically, the Court

2    noted that the patent's teaching that "a phosphor 48 can be mixed into an epoxy

3    resin as the transparent member 40C so that the transparent member 40C serves as a

4    wavelength conversion member" "explains how these two components can be

5    formed unitarily as claimed, *i.e.*, a single component serves two purposes, allowing

6    light to pass through and converting wavelength."  Dkt. 90 (*Markman* order) at 10.

7    In this example, the phosphor converts wavelength, and the resin–phosphor mixture

8    allows light to pass through.

9        Methodologies or tests to determine that a member that both converts

10   wavelength and allows light to pass through is "a single component" include at

11   least visual inspection of the member and material analysis (e.g., EDS testing).  For

12   example, visual inspection may reveal that a member is a transparent matrix (e.g.,

13   resin matrix) having particles (e.g., phosphor) mixed in it.  Optical imaging and

14   SEM imaging can further confirm that a member is a transparent matrix having

15   particles mixed in it, and may also confirm whether the particles are capable of

16   wavelength conversion.  Material analysis may reveal a type of resin (e.g., silicone),

17   and the type of particles mixed in the matrix (e.g., phosphor).  Expert analysis may

18   further confirm, based on the stated methodologies or tests, that a member is a

19   transparent matrix having particles mixed in it, and therefore a "single component

20   that both converts wavelength and allows light to pass through."

21       Methodologies or tests that are applicable for determining whether a member

22   is a wavelength conversion member formed unitarily with a transparent member

23   include at least the methodologies or tests identified above for determining (1)

24   whether a member is a wavelength conversion member and (2) whether a member

25   is a transparent member, and further the methodologies or tests identified above for

26   determining that a member is a "single component."  To avoid doubt, this means

27   that methodologies or tests that are applicable for determining whether a member is

28   a wavelength conversion member formed unitarily with a transparent member

include at least visual inspection of the member and the light output of the member; material analysis (e.g., EDS testing); and light spectroscopy.  Visual inspection of the member can identify known wavelength conversion materials (e.g., phosphor) and/or whether the member converts wavelength (e.g., if blue light with a certain spectrum is converted to another (or different) color light with a different spectrum).  Material analysis can identify known wavelength conversion materials (e.g., phosphor).  Light spectroscopy can be used to determine whether the member converts wavelength (e.g., if blue light with a certain spectrum is converted to another (or different) color light with a different spectrum).  Visual inspection of the member can be used to identify transparent materials and to assess whether a member allows light to pass through (e.g., if light is observed passing through the member).  Material analysis can identify known transparent materials (e.g., silicone).  Light spectroscopy can be used to determine that light from the light emitting element chips (e.g., blue light) passes through the member.  Visual inspection may reveal that a member is a transparent matrix having particles mixed in it.  Optical imaging and SEM imaging can further confirm that a member is a transparent matrix having particles mixed in it, and may also confirm whether the particles are capable of wavelength conversion.  Material analysis may reveal a type of resin (e.g., silicone), and the type of particles mixed in the matrix (e.g., phosphor).  Expert analysis may further confirm, based on the stated methodologies or tests, that a member is a transparent matrix having particles mixed in it, and therefore a "single component that both converts wavelength and allows light to pass through."

These methodologies or tests are further noted in Nichia's Final Infringement Contentions, and provide examples of results that establish the presence of "a wavelength conversion member formed unitarily with a transparent member" in the Accused Products.  Nichia's contentions include optical images showing that blue light is emitted from LED chips when the unitary resin–phosphor mixture sealing

1   the LED chips is removed, and white light is emitted when the yellow-colored

2   resin–phosphor mixture is present.  This indicates both wavelength conversion

3   (unconverted blue light mixes with converted yellow light to give the appearance of

4   white light) and allowing light to pass through (the unconverted blue light passes

5   through the resin–phosphor mixture to mix with yellow light).  Nichia's contentions

6   and testing results further include EDS material testing results to show phosphor (a

7   known wavelength conversion material) and silicone resin (a known transparent

8   material).  Finally, Nichia's contentions include light spectrum testing showing the

9   spectrum of light with and without the resin–phosphor mixture.  This also indicates

10  wavelength conversion and allowing light to pass through.  Each of these

11  methodologies or test is also identified in Nichia's response to this interrogatory.

12  The results in the contentions further show that the resin–phosphor mixture is a

13  single component.

14          Nichia further identifies, as "documents supporting Nichia's position," the

15  Court's *Markman* order (Dkt. 90), the *Markman* briefing and expert testimony on

16  this issue, Nichia's Initial Infringement Contentions, Nichia's Final Infringement

17  Contentions, the briefing related to Feit's motion to compel a supplemental

18  response by Nichia to this interrogatory, and documents NichiaFeit0041592-

19  NichiaFeit0050700 (testing results).

20          Nichia believes its response is complete.  However, to further clarify that

21  Nichia has provided a complete response, Nichia responds specifically to points

22  raised by Feit in briefing its motion to compel a supplemental response to this

23  interrogatory.

24          Feit specifically asked "Nichia to provide its bases regarding how to

25  distinguish a wavelength conversion member formed unitarily with a transparent

26  member from the other members, particularly from a wavelength conversion

27  member, as those terms have been defined by the Court."  As Nichia has explained,

28  if a member both converts wavelength and allows light to pass through, it is a

wavelength conversion member formed unitarily with a transparent member, but if
it either does not allow light to pass through or does not convert wavelength then it
is not.  For example, if all of the blue light emitted by LED chips is converted by a
member to yellow light, and no blue light passes through, that would indicate the
member is not transparent and therefore is not a wavelength conversion member
formed unitarily with a transparent member.  As another example, if all of the blue
light emitted by the LED chips passes through, but is not converted, that would
indicate the member is not wavelength converting and therefor is not a wavelength
conversion member formed unitarily with a transparent member.  However, if some
of the blue light emitted by LED chips is converted to yellow light, and some of the
blue light emitted by LED chips passes through, that would indicate that the
member is a wavelength conversion member formed unitarily with a transparent
member.

Feit further asserted that "Nichia's response does not identify what
determines if a member is a 'single component' and how the light transfer
properties or other characteristics distinguish it from the other disclosed members."
As explained above, methodologies or tests to determine that a member that both
converts wavelength and allows light to pass through is "a single component"
include at least visual inspection of the member and material analysis (e.g., EDS
testing).  These methodologies or tests may determine that a member is a
transparent (e.g., resin) matrix having particles (e.g., phosphor) mixed in it, and is
therefore a single component.  As explained above, if this "single component" both
converts wavelength and allows light to pass through, it is the claimed wavelength
conversion member formed unitarily with a transparent member.  However, if this
"single component" does not both convert wavelength and allow light to pass
through, it is not the claimed wavelength conversion member formed unitarily with
a transparent member.

1    Feit further asserted that "Nichia **must** identify why it asserts Feit Electric's
2    products encompass as a wavelength conversion member formed unitarily with a
3    transparent member as opposed to a wavelength conversion member of another
4    type."  Notably, this interrogatory does not ask about Feit's products, or ask Nichia
5    to explain its infringement contentions.  Notwithstanding, and as fully explained in
6    Nichia's Final Infringement Contentions, Nichia asserts that Feit's products
7    encompass a wavelength conversion member formed unitarily with a transparent
8    member because Feit's Accused Products have a resin–phosphor mixture, like what
9    the patent-in-suit describes as the claimed wavelength conversion member formed
10   unitarily with a transparent member.  This resin–phosphor mixture of Feit's
11   Accused Products is a single component that both converts wavelength and allows
12   light to pass through.

13   Feit further asserted that Nichia "fails to explain **how** one could be both a
14   wavelength conversion member and a transparent member, and moreover how it
15   can act as a 'single unit' under the Court's construction, rather than merely a
16   wavelength conversion member."  Consistent with the patent's specification and
17   with the Court's *Markman* order, the patent's teaching that "a phosphor 48 can be
18   mixed into an epoxy resin as the transparent member 40C so that the transparent
19   member 40C serves as a wavelength conversion member" "explains how these two
20   components can be formed unitarily as claimed, *i.e.*, a single component serves two
21   purposes, allowing light to pass through and converting wavelength."  Dkt. 90
22   (*Markman* order) at 10.  In particular, when phosphor is mixed into a resin, and
23   subsequently cured, the resultant resin matrix and phosphor (as well as any other
24   particles, such as fillers or diffusion agents, that are mixed into the matrix material)
25   forms a single component that has both the claimed light transmission properties
26   and wavelength conversion properties.

27   **SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY**
28   **NO. 13 (November 9, 2021):**

In addition to the prior responses, Nichia further identifies, as "documents supporting Nichia's position," documents NichiaFeit0041592-NichiaFeit0050700, NichiaFeit0055609-NichiaFeit0056504, NichiaFeit0056523-NichiaFeit0057978, NichiaFeit0057979-NichiaFeit0103942 (testing results).

**INTERROGATORY NO. 14:** Identify with specificity any agreements whether oral or written with the '734 Patent's named inventors, including without limitation, employment agreements, assignment agreements, agreements concerning any obligation for continued cooperation during litigation, agreements regarding statements on the validity of the '734 patent, and/or severance agreements.

**<u>Response</u>**: In addition to the foregoing general objections, Nichia objects to this Interrogatory to the extent it calls for information that is covered by the attorney-client privilege, the work-product doctrine, or other immunity from disclosure.  Nichia further objects to this Interrogatory on the ground that it is vague and unclear.  For example, "agreements … with the '734 Patent's named inventors" is undefined and vague.  Nichia interprets "agreements … with the '734 Patent's named inventors" to mean agreements between Nichia and the '734 Patent's named inventors.  Nichia further objects to this Interrogatory on the ground that it is overly broad and burdensome.  For example, "any agreements whether oral or written with the '734 Patent's named inventors" would encompass agreements regarding unrelated patents, and agreements (if any) involving irrelevant activity. Nichia understands the scope of the request to be limited to agreements that have some relationship to an issue in dispute.

Subject to and without waiver of the foregoing general and specific objections, Nichia identifies NichiaFeit0000265–NichiaFeit0000266, NichiaFeit0000269–NichiaFeit0000271, NichiaFeit0014592, NichiaFeit0020387–NichiaFeit0020390, NichiaFeit0028628, NichiaFeit0028645, and NichiaFeit0031122–NichiaFeit0031123.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INTERROGATORY NO. 15:** Identify with specificity any Nichia license agreement relating to or covering an element or component of a claim of the '734 patent.

**Response**: In addition to the foregoing general objections, Nichia objects to this Interrogatory to the extent it calls for information that is covered by the attorney-client privilege, the work-product doctrine, or other immunity from disclosure. Nichia objects to this Interrogatory on the ground that it is overly broad, vague and unduly burdensome. For example, "any Nichia license agreement," "relating to or covering," and "an element or component of a claim of the '734 patent" are overly broad, vague, and unduly burdensome because they are not limited in time or scope relevant to the proceedings. Nichia further objects to this Interrogatory as it calls for information protected by third-party confidentiality obligations.

Subject to and without waiver of the foregoing general and specific objections, Nichia responds that it does not and has not licensed the '734 patent. Nichia manufactures phosphor, light emitting diodes, and laser diodes, and as a regular part of its business activities invests significant time and money in research and development relating to such technology. Consequently, Nichia owns many different patents relating to such technology, including phosphors, light emitting diodes, and laser diodes, all of which relate to or cover elements of a claim of the '734 patent. Thus, while there is no license agreement that covers all elements of a claim of the '734 patent, Nichia identifies NichiaFeit0026709–NichiaFeit0027030, NichiaFeit0027071 – NichiaFeit0027102, NichiaFeit0027678–NichiaFeit0028627, and NichiaFeit0028646–NichiaFeit0029090 as relating to or covering phosphors, light emitting diodes, and/or laser diodes.

**INTERROGATORY NO. 16:** For each Accused Product, identify all center portions including their beginning, end, and any components within each, and identify any documents supporting Nichia's position.

**Response**: In addition to the foregoing general objections, Nichia objects to this Interrogatory to the extent it calls for information that is covered by the attorney-client privilege, the work-product doctrine, or other immunity from disclosure.  Nichia further objects to this Interrogatory on the ground that it is vague and unclear.  For example, "beginning, end, and any components within" is undefined and vague.  Further, "center portions" is ambiguous without further context.  Claims 1, 26, and 27 of the '734 Patent refer to a board having a center portion, but the way that the Interrogatory is phrased, it is not clear if other center portions (not of boards) are at issue.  Nichia interprets "center portions" to refer to "a board having end portions and a center portion therebetween in a longitudinal direction … a first region and a second region."  According to the Court's *Markman* order, "a board having end portions and a center portion therebetween in a longitudinal direction … a first region and a second region" is "a board with a first region running lengthwise from one end of the board to the center of the board, and a second region running lengthwise from the other end of the board to the center of the board."

Nichia further objects to this Interrogatory to the extent it calls for expert testimony.  Nichia will provide expert testimony on this subject in accordance with Court's scheduling orders.  Nichia further objects to this Interrogatory as the information sought is at least equally accessible to Feit.  Feit is asking about characteristics of its own products, not about Nichia's theories of infringement (which Nichia provided in detail in its Final Infringement Contentions).  Feit should know this information, or should have at least as much access to it as Nichia does.

Nichia further objects to this Interrogatory as overly broad and burdensome.  The "beginning, end, and any components within" a center portion are not relevant to whether an accused product has "a board with a first region running lengthwise from one end of the board to the center of the board, and a second region running lengthwise from the other end of the board to the center of the board."  Nichia

1  further objects to the extent that the Interrogatory is inconsistent with, or makes

2  assumptions unsupported by the Court's *Markman* order construing the phrase "a

3  board having end portions and a center portion therebetween in a longitudinal

4  direction … a first region and a second region."

5      Nichia further objects to this Interrogatory on the grounds that it constitutes

6  multiple subparts.  It asks for (i) "all center portions," (ii) their beginning, (iii) their

7  end, (iv) any components within each, and (v) "any documents supporting Nichia's

8  position."  Accordingly, this Interrogatory counts as at least five separate

9  interrogatories.

10      Subject to and without waiver of the foregoing general and specific

11  objections, Nichia responds that the accused products each have "a board having

12  end portions and a center portion therebetween in a longitudinal direction … a first

13  region and a second region" as construed by the Court, i.e. "a board with a first

14  region running lengthwise from one end of the board to the center of the board, and

15  a second region running lengthwise from the other end of the board to the center of

16  the board."  Nichia identified this with specificity in its Final Infringement

17  Contentions.  For example, Nichia stated the following in its contentions:

18

19

20

21

22

23

24

25

26

27

28

G2560W/950CA/FIL/3(W):



The first region identified above runs lengthwise from one end of the board to the center of the board, and the second region identified above runs lengthwise from the other end of the board to the center of the board.

See Page A8 of Exhibit A to Nichia's Final Infringement Contentions; see also Page A9 (referring to "similar images of other exemplary filament products").

Nichia further states that the Accused Products each have an elongated board having a center in a longitudinal direction between two ends. This center may be found, for example, by observing or measuring the board and determining the center of the board in a longitudinal direction between the two ends.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 16 (August 16, 2021):**

Pursuant to the Court's August 2, 2021 Order (Dkt. No. 173), Nichia provides the following additional information regarding its identification of the "center portions" for each Accused Product.

Each Accused Product includes a board that has a center portion that is between two end portions in a longitudinal direction. *See* Nichia's Final Infringement Contentions, Exhibit A at A8-A18 (claim element 1.1) and Exhibit B

at B5-B7 (claim element 1.1); claim 1 ("a board having end portions and a center portion therebetween in a longitudinal direction").  That is, the board's center is, in each of the Accused Products, between the board's two ends in a lengthwise direction.  *See* Dkt. 90 (construing "center portion" as center, "end portions" as ends, and "longitudinal" as lengthwise).

Nichia understands the center of the board in each of the Accused Products, as the Court has construed the "center portion" term, to refer to a geometric center such that the board's center is equidistant from the board's ends in a lengthwise direction.  That is, for each Accused Product, the beginning and end of the center portion coincides with the board's geometric center, which is a line across the board's width that is equidistant from the board's ends in a lengthwise direction.  This can be illustrated as follows:



With reference to the illustration, the center portion of each Accused Product is identified as a line at a position *l*/2 from each end of the product's board, where *l* is the length of the product's board.  For a given Accused Product, if a light emitting element chip lies on the board's center, that light emitting element chip is not part of the "first set" or "second set" of the light emitting element chips.  *See* Dkt. 87 at 8-9 ("[A]n LED chip within or at the 'center portion' would not be part of either the first or second set of chips because it would not be mounted on the first or second region.").  That is, it would be within the center portion.

45

1     Nichia understands the Court's construction to refer to a geometric center,

2   consistent with Nichia's arguments during claim construction.  To the extent that a

3   center portion must have a width, Nichia additionally identifies[3]:

4     For a given Accused Product comprising a plurality of light emitting element

5   chips, any area of the product's board centered on the board's geometric center and

6   having a width $w$, where $0 < w < l$ for a board of length $l$, and such that there are at

7   least two light emitting element chips strictly to the left of the area (*i.e.*, from the

8   beginning of the center portion to one end of the board) and at least two light

9   emitting element chips strictly to the right of the area (*i.e.*, from the end of the

10  center portion to the other end of the board) in a lengthwise direction of the board:

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

_____

26  [3] Feit apparently takes the position that the "center portion" does not refer to the geometric center.  Nichia does not acquiesce to Feit's apparent position, and

27  Nichia's position is that its identification of the center portion in the Accused Products is correct, sufficient, and consistent with the Court's construction.

28  Nonetheless, Nichia describes how one could identify a center portion having a width, to the extent Feit's apparent position is deemed relevant.

46



center portion

For each of the values of $w$ identified above (*i.e.*, $0 < w < l$, with two chips to the left and right of the area), the "beginning" of the center portion is at a distance $w/2$ from the board's geometric center (shown as dotted line) to one end of the board, and the "end" of the center portion is at a distance $w/2$ from the board's geometric center to the other end of the board.

For a given Accused Product, if a light emitting element chip lies within a distance $w/2$ from either side of the board's geometric center, that light emitting element chip is not part of the "first set" or "second set" of the light emitting element chips. *See* Dkt. 87 at 8-9 ("[A]n LED chip within or at the 'center portion' would not be part of either the first or second set of chips because it would not be mounted on the first or second region."). That is, it would be within the center portion. As noted, and as discussed during claim construction briefing and the Court's Markman Order, the width $w$ is constrained by other requirements of the claim. *See* Dkt. 90, p. 9 ("The Court agrees with Plaintiff that the disputed limitations are not indefinite, because the 'end portions,' 'center portion,' 'first region,' and 'second region' are ***defined relative to each other*** and the 'first set' and 'second set' of chips.") (emphasis added).

Nichia additionally notes that when it refers to distance on a product's board, such as a geometric center of a board equidistant from the board's ends in a lengthwise direction, or a distance $w/2$ from the board's geometric center, it is

referring to a distance along a first surface side of the board.  To avoid doubt, this means that for the Accused Curved-Filament Products, the geometric center of the board is the same regardless of the configuration of the flexible LED filament.

Nichia further identifies, as "documents supporting Nichia's position," the Court's *Markman* order (Dkt. 90), the *Markman* briefing and expert testimony on this issue, Nichia's Initial Infringement Contentions, Nichia's Final Infringement Contentions, the briefing related to Feit's motion to compel supplemental response by Nichia to Interrogatory No. 16, and documents NichiaFeit0041592-NichiaFeit0050700 (testing results, e.g. showing a product's board).

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 16 (September 15, 2021):**

In addition to the foregoing, and consistent with Feit's request and the parties' discussion during the September 2, 2021 meet and confer, Nichia provides in the enclosed Appendix A, a visual depiction of the geometric center of the board in the products charted in Nichia's Final Infringement Contentions.

**THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 16 (November 9, 2021):**

In addition to the prior responses, Nichia further identifies, as "documents supporting Nichia's position," documents NichiaFeit0041592-NichiaFeit0050700, NichiaFeit0055609-NichiaFeit0056504, NichiaFeit0056523-NichiaFeit0057978, NichiaFeit0057979-NichiaFeit0103942 (testing results, e.g. showing a product's board).

**INTERROGATORY NO. 17:** Identify with specificity the methods for creating, manufacturing, or making a wavelength conversion member formed unitarily with a transparent member known to Nichia, including but not limited to the inventors of the '734 patent, as of the priority date of the '734 patent, and identify any documents supporting Nichia's position.

**Response**: In addition to the foregoing general objections, Nichia objects to this Interrogatory to the extent it calls for information that is covered by the attorney-client privilege, the work-product doctrine, or other immunity from disclosure.  Nichia further objects to this Interrogatory on the grounds that it is overly broad and burdensome and not relevant to any issue in dispute.

Nichia further objects to this Interrogatory on the grounds that it constitutes multiple subparts.  It asks for (i) "the methods for creating, manufacturing, or making a wavelength conversion member formed unitarily with a transparent member known to Nichia," and (ii) "any documents supporting Nichia's position." Accordingly, this Interrogatory counts as at least two separate interrogatories.

Subject to and without waiver of the foregoing general and specific objections, Nichia responds that the '734 Patent describes methods for creating, manufacturing, or making a wavelength conversion member formed unitarily with a transparent member.  See '734 Patent, FIGS. 6-7, 2:28-33, 7:49-59; 11:38-13:54. This disclosure was known to Nichia as of the priority date of the '734 Patent.

Nichia further states that methods known to it as of the priority date of the '734 Patent included, but were not limited to, at least the methods disclosed in any of JPA2002-148442; US 7,488,432; US 7,112,636; US 6,953,952; US 6,737,681; US 6,924,514; and JPA 2004-363342.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 17 (August 17, 2021):**

Pursuant to the Court's August 3, 2021 Order (Dkt. No. 178), Nichia provides the following additional information.

As described in the patent-in-suit, specifically at the column and line numbers that Nichia previously identified, phosphor can be mixed into a resin to create a single component that both converts wavelength and allows light to pass through.  *E.g.*, '734 Patent, 7:49-53 ("a phosphor 48 can be mixed into an epoxy resin as the transparent member 40C so that the transparent member 40C serves as a

wavelength conversion member"); *id.*, 7:53-59 ("a phosphor 48 is mixed into a silicone resin that forms the covering member 46B so that the covering member 46B serves as both a covering member and a wavelength conversion member"). After mixing, the resin and phosphor are not distinct members.

In addition to phosphor, other particles may be mixed into the resin matrix in order to affect the properties of the phosphor-containing resin. After mixing, the resin and other particles are also not distinct members. As examples of other particles, diffusion agents and fillers may be mixed into the resin matrix. *E.g.*, '734 Patent, 13:11-17 ("In addition, a diffusion agent can be added to the phosphor-containing resin in addition to a phosphor. Specifically, barium titanate, titanium oxide, aluminum oxide, silicon oxide, and so on, can be suitably used as the diffusion agent. In this case, it is possible to provide a light emitting device with suitable directivity."); *id.*, 13:34-44 ("In addition, a filler can be added to the phosphor-containing resin in addition to a phosphor…. In the case where a transparent resin contains this type of filler, chromaticity unevenness of the light emitting device can be improved by light dispersion, and additionally thermal shock resistance of the transparent resin can be improved.").

Additionally, the resin–phosphor mixture is typically cured. Before curing, the phosphor-containing resin is liquid with low viscosity and spreads. After curing, the phosphor-containing resin may still be soft, but has solidified to the point where it will not spread freely. *E.g.*, '734 Patent, 12:59-66 ("It is preferable that the phosphor-containing resin is soft even after curing. Before curing, it is preferable that the phosphor-containing resin is liquid with low viscosity. The reason is that the phosphor-containing resin spreads over the periphery of the light emitting element 10, and that the phosphor-containing resin fills interstices except that electrical connection parts between the light emitting element 10 that is mounted in a flip chip manner and lead terminals").

1     This process – *i.e.*, mixing resin with phosphor and optionally additional

2 particles such as fillers and diffusion agents, allowing the resin mixture to spread,

3 and then curing the resin mixture – creates a single component that is capable of

4 wavelength conversion and light transmissivity.  In particular, the single component

5 so created both converts wavelength and allows light to pass through.  The color of

6 light that is perceived from a light emitting device comprising a wavelength

7 conversion member formed unitarily with a transparent member will depend on

8 properties of the resin–phosphor mixture and the light generated by LED chips

9 sealed by the resin–phosphor mixture.  For example, blue light emitted by the LED

10 chips may be partially converted to yellow light by phosphor (e.g., a YAG group

11 phosphor) in the resin–phosphor mixture, so as to create the impression of white

12 light when the unconverted portion of the blue light mixes with the converted

13 yellow light.  A desired color of light may be created by controlling the properties

14 of the resin–phosphor mixture and the light generated by LED chips sealed by the

15 resin–phosphor mixture.  *E.g.*, '734 Patent, 11:44-46 ("Light emission of the light

16 emitting element 10 and the converted radiation are mixed to emit desired color

17 light externally.").

18     In addition to the disclosure of the '734 Patent, Nichia also identified

19 additional documents, *i.e.*, JPA2002-148442; US 7,488,432; US 7,112,636; US

20 6,953,952; US 6,737,681; US 6,924,514; and JPA 2004-363342.  As an example of

21 this disclosure, US 7,488,432 describes how to make a resin–phosphor mixture:

22

23     FIG. 5 is a schematic drawing of a light-emitting device
      which is one embodiment of the present invention. FIG. 5(b) is a
24    drawing in which the principal portion of the light-emitting device
      shown in FIG. 5(a) is enlarged. This light-emitting device contains
25    a light-emitting element (LED chip) 10 composed of a
      semiconductor layer laminated on the upper surface of a sapphire
26    substrate; lead frames 13a and 13b electrically connected by
      conductive wires 14 extending from the positive and negative
27    electrodes formed on the same plane as the semiconductor layer;
      phosphors 11a and 11b disposed in the cup of lead frames 13a and

28

1
2
3

13b such that the light-emitting element, which is composed of the sapphire substrate and the semiconductor layer, is encapsulated; coating material 12; and molded item 15 covering the phosphors and the exterior portion of the lead frames.

4
5
6
7
8
9
10
11
12
13
14
15
16

Using the dispenser of the molding device, the coating material containing the first phosphor 11a and the second phosphor 11b is introduced into the cup created in the lead frame. Phosphors 11a and 11b in the coating material are uniformly mixed beforehand in a desired proportion. The coating material containing the phosphors is poured into the cup of the lead frame, and the lead frames are dipped into a mold in which a resin that is to become the molded item has been poured. The resin is then removed from the mold and cured, thereby giving a lamp-type light-emitting device as shown in FIG. 5(a). Phosphors 11a and 11b can also be used as a mixture in the molded item without the use of the coating material. However, as described above, by having the light-storing first phosphor 11 a and the second phosphor 11b in the coating material, color conversion efficiently proceeds when power is supplied, thereby creating a mixed-color emission having excellent color rendering properties. Moreover, even when no power is supplied, i.e., after the termination of the power supply, the color of the emitted light can be substantially the same as that obtained when the power is supplied.

17
18

US 7,488,432, 28:36-29:14.  As to the coating material that the phosphor is mixed in, the specification further explains:

19
20
21
22
23
24
25

Coating material 12, which functions as a wavelength-converting member, is provided in the cup of lead frame 13 and mixed for use with first phosphor 11a that converts the energy emitted by the LED chip 10 and the second phosphor 11b. Specific examples of materials for the coating material 12 are transparent resins having good temperature properties and weather resistance, such as epoxy resins, urea resins, and silicone resins; silica sols; glasses; inorganic binders; etc. The coating material may contain, in addition to the phosphors 11a and 11b, a diffusing agent, barium titanate, titanium oxide, aluminum oxide, etc. A light stabilizer and a coloring agent may also be used.

26
27
28

The concentration of the fluorescent material of the invention in the coating material can be suitably selected according to the application. Proportion of the fluorescent material to be used is

usually about 0.05 to about 5 per the entire coating member containing the fluorescent material.

US 7,488,432, 37:1-19.

Nichia further identifies, as "documents supporting Nichia's position," the '734 Patent and its corresponding priority applications, each of JPA2002-148442; US 7,488,432; US 7,112,636; US 6,953,952; US 6,737,681; US 6,924,514; and JPA 2004-363342, and their corresponding priority applications; and the briefing related to Feit's motion to compel a supplemental response by Nichia to this interrogatory.

Nichia believes its response is complete.  However, to further clarify that Nichia has provided a complete response, Nichia responds specifically to points raised by Feit in briefing its motion to compel a supplemental response to this interrogatory.

Feit has argued that it wants to know "how does one create 'a single component that both converts wavelength and allows light to pass through' as defined by the Court and differentiated from the process of creating a wavelength conversion member generally."  Nichia answered in its original response, and has supplemented its response to further provide the process for creating "a single component that both converts wavelength and allows light to pass through" as defined by the Court.  In particular, as Nichia explained, the Court itself has stated that the description in the specification teaching that "a phosphor 48 can be mixed into an epoxy resin as the transparent member 40C so that the transparent member 40C serves as a wavelength conversion member" "explains how these two components can be formed unitarily as claimed, *i.e.*, a single component serves two purposes, allowing light to pass through and converting wavelength."  Dkt. 90 (*Markman* order) at 10.

Nichia further notes that "a wavelength conversion member generally" includes a wavelength conversion member formed unitarily with a transparent member.  To the extent Feit wants to know how to create a wavelength conversion

53

1    member that is not a wavelength conversion member formed unitarily with a

2    transparent member, that is not what its interrogatory has asked (nor what is

3    claimed).  Nonetheless, Nichia notes that Mr. Matsushita (one of the inventors of

4    the '734 patent) has testified that the amount of phosphor included in the resin–

5    phosphor mixture can determine the amount of light, if any, that passes through the

6    mixture unconverted.  *See* Matsushita Deposition Transcript, 122:21-123:6 ("Q.

7    What purpose does the phosphor serve when it's mixed in with the resin?  A. The

8    phosphor has -- is nature to absorb blue color or blue light and then emit yellow

9    light, and there is the wavelength conversion in it, but if you put too much

10   phosphor, then the light is not likely to come out, or I would say the output of the

11   volume of light goes down. And in order for me to make the -- to make the right

12   consistency, we mix with -- mix it with resin. It's almost like diluting it. So that

13   serves its purpose.").  As another example, a dense layer of purely phosphor may

14   emit only converted light (*e.g.*, yellow light) without passing any unconverted light

15   (e.g., blue light).

16         Feit has further stated that "if Nichia's position is that these labels—i.e.,

17   sealing member, covering member, transparent member, wavelength conversion

18   member, and their combinations—are interchangeable, it should so state," and that

19   "if Nichia believes a distinction exists, it should describe it while explaining any

20   deviations between its view and the corresponding descriptions in its patent."  This

21   is not what the interrogatory asks for.  Nonetheless, to avoid further motion practice

22   with the Court, Nichia will again explain these terms.  Nichia's view is what the

23   '734 Patent describes, that is, there is no deviation between Nichia's view and the

24   corresponding descriptions in the '734 Patent.

25         The '734 Patent uses the terms sealing member and covering member

26   interchangeably, describes this member as being "formed of a transparent resin,"

27   and because the member seals or covers the light emitting element chips, in order

28   for light to outgo of the light emitting device, the member should be a transparent

1   member, *i.e.*, allow light to pass through.  '734 Patent, 6:52-62 (explaining that the

2   covering member is formed of a transparent resin and that the resin forming the

3   covering member covers the light emitting element chips); *compare id.*, 2:31-33

4   (describing FIG. 7 as showing a wavelength conversion member and a sealing

5   member being formed unitarily) *with* 7:53-56 (describing FIG. 7 as showing a

6   wavelength conversion member and a covering member being formed unitarily).

7   After describing the covering member, the '734 Patent introduces a second

8   transparent member that can additionally cover the covering member.  '734 Patent,

9   6:63-7:12.

10         Each of the sealing member, covering member, and second transparent

11  member are examples of transparent members as each of these members allows

12  light to pass through.  The '734 Patent further explains that each of these members

13  can also be made by mixing phosphor and resin such that the members both convert

14  wavelength and allow light to pass through and are therefore examples of how to

15  make a wavelength conversion member formed unitarily with a transparent

16  member.  '734 Patent, 7:49-53 ("a phosphor 48 can be mixed into an epoxy resin as

17  the [second] transparent member 40C so that the [second] transparent member 40C

18  serves as a wavelength conversion member"); *id.*, 7:53-59 ("a phosphor 48 is mixed

19  into a silicone resin that forms the covering member 46B so that the covering

20  member 46B serves as both a covering member and a wavelength conversion

21  member").  Nichia's response to this interrogatory, therefore, is fully consistent

22  with what the '734 Patent describes and with how the Court has construed the

23  claims.

24

25  **INTERROGATORY NO. 18:** Identify with specificity any alterations to the light
    emanating from each LED in the accused products including but not limited to any
26  directional changes, absorption, conversion, or dissipation that occur to the light
    and the cause of any such change, and identify any documents supporting Nichia's
27  position.

28

55

**Response**: In addition to the foregoing general objections, Nichia objects to
this Interrogatory to the extent it calls for information that is covered by the
attorney-client privilege, the work-product doctrine, or other immunity from
disclosure.  Nichia further objects to this Interrogatory on the ground that it is
vague and unclear.  For example, "any alterations to the light emanating from each
LED," "directional changes," "absorption," "conversion," and "dissipation" are
undefined and vague.  Further, the Accused Products have varying operational
states, for example, where they may be turned off or powered at varying degrees.
When turned off, no light is emitted from the LEDs.  When powered at varying
degrees, the nature of any alterations to the light emanating from each LED will
depend on the amount of power applied to the LEDs, as well as the environment in
which the accused product is located.  Nichia further objects to this Interrogatory as
overly broad and burdensome, as it appears to cover alterations to the light with no
relevance to an issue in dispute.

Nichia further objects to this Interrogatory as the information sought is at
least equally accessible to Feit.  Feit is asking about characteristics of its own
products, not about Nichia's theories of infringement (which Nichia provided in
detail in its Final Infringement Contentions).  Feit should know this information, or
should have at least as much access to it as Nichia does.  Further, to the extent that
the Interrogatory seeks out the causes of any light alterations, Feit is equally able to
understand the cause of the light alterations.  Nichia further objects to this
Interrogatory to the extent it calls for expert testimony.  Nichia will provide expert
testimony on this subject in accordance with Court's scheduling orders.

Nichia further objects to this Interrogatory on the grounds that it constitutes
multiple subparts.  It asks for (i) "any alterations to the light emanating from each
LED in the accused products," (ii) "the cause of any such change," and (iii) "any
documents supporting Nichia's position."  Accordingly, this Interrogatory counts as
at least three separate interrogatories.

1         Subject to and without waiver of the foregoing general and specific

2  objections, Nichia responds as follows.  Claims 1, 26, and 27 of the '734 Patent

3  require "a wavelength conversion member formed unitarily with a transparent

4  member that seals the plurality of light emitting element chips," which is, per the

5  Court's *Markman* order, "a single component that both converts wavelength and

6  allows light to pass through."  Nichia's Final Infringement Contentions specify the

7  conversion of wavelength that occurs to the light emanating from each LED in the

8  Accused Products.  For example, Nichia's contentions state that "The wavelength

9  conversion member, which is formed unitarily with the transparent member,

10  converts light from an LED chip (e.g., blue light) to a second color (e.g., yellow

11  light)."  See Page A24 of Exhibit A to Nichia's Final Infringement Contentions; see

12  also Pages A25-A32.  For example:

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

G2560W/950CA/FIL/3(W):



light emitting element chip          (chip in "on" state)



wavelength
conversion

See Page A25 of Exhibit A to Nichia's Final Infringement Contentions.

Claim 18 of the '734 Patent further requires that "the wavelength conversion member is capable of converting light emitted from the plurality of light emitting element chips into light with a different wavelength such that the converted light with the different wavelength is radiated along a first direction from the first surface side of the board to an outer periphery of the wavelength conversion member, and along a second direction from the second surface of the board to the outer periphery of the wavelength conversion member." Again, Nichia's Final Infringement Contentions specify the radiation of the converted light with a different wavelength along the first direction and the second direction. For example, Nichia's contentions state that "The wavelength-converted light radiates out from the front and the back sides of the board." See Page A68 of Exhibit A to Nichia's Final Infringement Contentions; see also Pages A69-A72. For Example:

G2560W/950CA/FIL/3(W):



See Page A68 of Exhibit A to Nichia's Final Infringement Contentions.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 18 (August 17, 2021):**

Pursuant to the Court's August 3, 2021 Order (Dkt. No. 178), Nichia provides the following additional information.

The light emanating from each LED in the Accused Products will be altered by the resin–phosphor mixture that seals the LEDs. This will include directional changes, absorption, conversion, and potentially dissipation of the light. The phosphor, resin, and other particles such as fillers and diffusion agents in the resin–phosphor mixture are responsible for these alterations. '734 Patent, 11:38-41 ("A phosphor converts visible light or ultraviolet light that is emitted from the light emitting element 10 into light with different wavelength. In this case, the phosphor is used as a wavelength conversion material, which ***absorbs*** light and emits luminescent radiation with wavelength ***longer than*** the wavelength of absorbed light.") (emphasis added); 13:18-32 ("The diffusion agent of not less than 1 nm to less than 5 μm excellently ***scatters*** light from the light emitting element 10 and phosphor, and thus suppresses color unevenness that tends to appear in the case where a phosphor with a large particle size is used. For this reason, this type of diffusion agent is suitably used. In addition, the spectral half-value width in light emission can be narrow. Therefore, it is possible to a light emitting device with

high color purity. A diffusion agent of not less than 1 nm to less than 1 μm has a small interference effect on the wavelength of light from the light emitting elements 10, but has high transparency, and additionally can increase viscosity of resin without reduction of luminous intensity.") (emphasis added); 13:40-44 ("In the case where a transparent resin contains this type of filler, chromaticity unevenness of the light emitting device can be improved by *light dispersion*, and additionally thermal shock resistance of the transparent resin can be improved.") (emphasis added).

The Accused Products are designed to emit white color light. This is accomplished in the Accused Products by using a blue LED light source and phosphors that emit yellow light. The generation of white light from a combination of blue and yellow sources may be understood using the following illustration:



As shown above, light is emitted from a blue LED chip, which is partially *absorbed* and partially *reflected* by the phosphor particles. A phosphor is a chemical compound that can convert light from one wavelength to another by absorbing light that impinges on it and then re-emitting light of a different wavelength. When the re-emitted light has a longer wavelength than the light that was absorbed, the process is called down-conversion. When the re-emitted light has a shorter wavelength, the process is called up-conversion. As light from the LED chip passes through a material (e.g., a resin mixture) containing the phosphor

particles, the light may be reflected a number of times by different phosphor particles, it may be converted (e.g., from blue to yellow) as it is absorbed and re-emitted by a phosphor particle, or it may pass through the phosphor particle unchanged.  Eventually, the light may exit the material after it has passed by or through several phosphor particles.

A phosphor particle typically converts light in a given wavelength range, with light outside that range reflecting off the particle or passing through it.  For example, the yellow light emitted from one phosphor particle may pass through another phosphor particle of the same type without undergoing further wavelength conversion.  Further, depending on the size of the phosphor particle and an absorption coefficient specific to the type of phosphor, some of the blue light from the LED chip may also pass through the phosphor particle with its wavelength unchanged.  For example, some of the blue light from the LED chip may pass through the phosphor particle and some may be converted to yellow light.  In the Tanda '734 Patent, for example, the light emitting device uses a "wavelength conversion member" comprising a phosphor to "absorb light emitted by the light emitting element and convert its wavelength so as to emit luminescent radiation with different wavelength." '734 Patent, 7:25-45.  Additionally, when phosphor particles are mixed into a transparent medium (such as a resin), some of the light may pass through the medium bypassing the phosphor particles, either without interacting with the phosphor particles at all or reflecting off of the phosphor particles without wavelength conversion as shown in the diagram above.  The size, density, and distribution of the phosphor particles (*see, e.g.*, '734 Patent, 12:8-34) may affect the amount of light that passes through the medium bypassing the phosphor particles.

In the example above, when the phosphor absorbs the blue light, it emits its own yellow light.  In the Accused Products, the resin–phosphor mixture contains numerous phosphor particles, and light may pass through the mixture unimpeded,

1   be reflected by one or more particles, be converted, and/or scatter due to a diffusion

2   agent in the mixture.  The combination of light generated by the LED chips that

3   pass through the resin–phosphor mixture without being converted and the converted

4   light emitted from the phosphor mix to produce a uniform white light.

5          Nichia notes that the resin of the Accused Products likely does not have

6   perfect transmissivity, the phosphor is not perfectly efficient at conversion, and

7   both materials may be subject to degrade over time and through exposure to heat

8   and other types of energy.  The precise alterations to light emanating from each

9   LED in the Accused Products, in addition to these factors, will also vary depending

10  on the power being applied to the Accused Products.

11         Nichia further identifies, as "documents supporting Nichia's position," the

12  Court's *Markman* order (Dkt. 90), the *Markman* briefing and expert testimony on

13  this issue, Nichia's Initial Infringement Contentions, Nichia's Final Infringement

14  Contentions, the briefing related to Feit's motion to compel a supplemental

15  response by Nichia to this interrogatory, and documents NichiaFeit0041592-

16  NichiaFeit0050700 (testing results).

17         Nichia believes its response is complete.  However, to further clarify that

18  Nichia has provided a complete response, Nichia responds specifically to points

19  raised by Feit in briefing its motion to compel a supplemental response to this

20  interrogatory.

21         Feit specifically asked "is there any light that is absorbed or is the purported

22  'wavelength conversion member formed unitarily with a transparent member' (that,

23  as explained above, Nichia refuses to identify) 100% effective?"  As an initial

24  matter, Nichia has consistently and repeatedly identified the wavelength conversion

25  member formed unitarily with a transparent member in the Accused Products.

26  Nichia identifies this member as the resin–phosphor mixture that seals the LED

27  chips, as identified in Nichia's Final Infringement Contentions.  As to whether this

28  member is 100% effective, as Nichia noted above, resin typically does not have

1 | perfect transmissivity, phosphor is not usually perfectly efficient at conversion, and
2 | both materials are subject to degrade over time and through exposure to heat and
3 | other types of energy.  Accordingly, Nichia does not allege that Feit's products are
4 | "100% effective."

5 |     Feit also asserts that it "is entitled to understand if Nichia alleges the light is
6 | changed, absorbed, converted or dissipated in a single location or dispersed and
7 | whether, for instance, certain components of the alleged 'wavelength conversion
8 | member formed unitarily with a transparent member' are performing some or all of
9 | these alterations."  The phosphor in the resin–phosphor mixture is responsible for
10 | converting wavelength, and there are numerous phosphor particles dispersed
11 | throughout the mixture in the Accused Products.  Additionally, light may be
12 | reflected by one or more of the numerous phosphor particles, scattered by a
13 | diffusion agent, and/or reflected by a filler in the resin–phosphor mixture.

14 |     Feit further asserts that "Nichia has not explained, for instance, how to
15 | determine where on any accused product light is converted, where it passes
16 | through, or both (or even how to differentiate between such effects)."  Light is
17 | converted by phosphor in the resin–phosphor mixture in each Accused Product.
18 | Nichia's Final Infringement Contentions, and testing data, identify specific
19 | phosphor particles in the Accused Products.  Light may pass through the resin–
20 | phosphor mixture, and Nichia has also identified this in its Final Infringement
21 | Contentions.  Indeed, the LED chips emit blue light, and the phosphor emits yellow
22 | light; therefore, the fact that the Accused Products emit white light is a result of
23 | unconverted blue light passing through the resin–phosphor mixture and mixing with
24 | the converted yellow light to give the appearance of white light.

25 | **SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY**
26 | **NO. 18 (November 9, 2021):**

27 |     In addition to the prior responses, Nichia further identifies, as "documents
28 | supporting Nichia's position," documents NichiaFeit0041592-NichiaFeit0050700,

1   NichiaFeit0055609-NichiaFeit0056504, NichiaFeit0056523-NichiaFeit0057978,

2   NichiaFeit0057979-NichiaFeit0103942 (testing results).

3

4   **INTERROGATORY NO. 19:** Identify with specificity the makeup of "yellow

5   wavelength conversion member" identified on A24 of Nichia's infringement

    contentions, including but not limited to the specific composition of the member

6   including its various ingredients, the process used to form the member, and any

7   changes to the ingredients as a result of the formation process, and identify any

    documents supporting Nichia's position.

8         <u>**Response**</u>: In addition to the foregoing general objections, Nichia objects to

9   this Interrogatory to the extent it calls for information that is covered by the

10  attorney-client privilege, the work-product doctrine, or other immunity from

11  disclosure.  Nichia further objects to this Interrogatory on the ground that it is

12  vague and unclear.  For example, "specific composition," "various ingredients,"

13  "process used to form," and "any changes to the ingredients as a result of the

14  formation process" are undefined and vague.  Nichia further objects to this

15  Interrogatory to the extent it calls for expert testimony.  Nichia will provide expert

16  testimony on this subject in accordance with Court's scheduling orders.

17        Nichia further objects to this Interrogatory as the information sought is at

18  least equally accessible to Feit.  Feit is asking about characteristics of its own

19  product, not about Nichia's theories of infringement (which Nichia provided in

20  detail in its Final Infringement Contentions).  Feit should know this information, or

21  should have at least as much access to it as Nichia does.

22        Nichia further objects to this Interrogatory on the grounds that it constitutes

23  multiple subparts.  It asks for (i) "the makeup of 'yellow wavelength conversion

24  member' identified on A24 of Nichia's infringement contentions," (ii) "the process

25  used to form the member," (iii) "any changes to the ingredients as a result of the

26  formation process," and (iv) "any documents supporting Nichia's position."

27  Accordingly, this Interrogatory counts as at least four separate interrogatories.

28

Subject to and without waiver of the foregoing general and specific objections, Nichia responds as follows. Page A24 of Exhibit A to Nichia's Final Infringement Contentions references a "yellow wavelength conversion member" with respect to establishing that the Accused Products include "a wavelength conversion member formed unitarily with a transparent member that seals the plurality of light emitting element chips," which is, per the Court's *Markman* order, "a single component that both converts wavelength and allows light to pass through." Specifically, Nichia's Final Infringement Contentions state:

> In the accused products, the light emitting element chips (e.g., LED chips) are surrounded by a combination of yellow wavelength conversion member (a component that converts wavelength) and transparent member (a component that allows light to pass through). This combination of yellow wavelength conversion member and transparent member is a single component that both converts wavelength and allows light to pass through. For instance, the filaments include a phosphor in a transparent resin that seals the LED chips. See, e.g., cross-sectional image of G2560W/950CA/FIL/3(W):



> The wavelength conversion member, which is formed unitarily with the transparent member, converts light from an LED chip (e.g., blue light) to a second color (e.g., yellow light).

1  See Page A24 of Exhibit A to Nichia's Final Infringement Contentions.  Nichia's

2  contentions further point out other photographs (of the model

3  G2560W/950CA/FIL/3(W) as well as other models) of the LED filaments in the

4  Accused Products, the LED chips within the LED filaments, and the board of the

5  LED filaments with and without the yellow encapsulant material.  See Pages A25-

6  A32 of Exhibit A to Nichia's Final Infringement Contentions.

7       With respect to model G2560W/950CA/FIL/3(W) (identified on page A24),

8  the single component that both converts wavelength and allows light to pass

9  through is a silicone resin with phosphor particles mixed in the silicone resin.  The

10  wavelength-converting phosphor particles include, for instance, a YAG group

11  phosphor that gives the component a yellow appearance.  Additionally, material

12  testing shown at Page A55, indicates the presence of a YAG group phosphor and a

13  silicone resin.  This testing, reproduced below, is shown in context of the element

14  of claim 6 requiring that "the wavelength conversion member comprises a phosphor

15  therein" which, per the Court's *Markman* order, means that "the wavelength

16  conversion member contains a phosphor":

17

18

19

20

21

22

23

24

25

26

27

28



Nichia's testing of the Accused Products is ongoing, and Nichia will supplement this Interrogatory response as appropriate.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 19 (November 9, 2021):**

In addition to the prior responses, Nichia further identifies, as documents supporting Nichia's position, documents NichiaFeit0041592-NichiaFeit0050700, NichiaFeit0055609-NichiaFeit0056504, NichiaFeit0056523-NichiaFeit0057978, NichiaFeit0057979-NichiaFeit0103942 (testing results).

**INTERROGATORY NO. 20:** For each Accused Product, identify with specificity the support function performed by the support leads identified in Nichia's Final Infringement Contentions including but not limited to what they support, the amount of support provided, and whether such support is necessary to the device, and identify any documents supporting Nichia's position.

**Response**: In addition to the foregoing general objections, Nichia objects to this Interrogatory to the extent it calls for information that is covered by the

67

1   attorney-client privilege, the work-product doctrine, or other immunity from

2   disclosure.  Nichia further objects to this Interrogatory on the ground that it is

3   vague and unclear.  For example, "support function," "amount of support

4   provided," and "whether such support is necessary" are undefined and vague.

5   Nichia further objects to this Interrogatory to the extent it calls for expert testimony.

6   Nichia will provide expert testimony on this subject in accordance with Court's

7   scheduling orders.

8       Nichia further objects to this Interrogatory on the grounds that it constitutes

9   multiple subparts.  It asks for (i) "the support function performed by the support

10  leads identified in Nichia's Final Infringement Contentions," and (ii) any

11  documents supporting Nichia's position.  Accordingly, this Interrogatory counts as

12  at least two separate interrogatories.

13      Subject to and without waiver of the foregoing general and specific

14  objections, Nichia responds that the support leads provide sufficient support to

15  "secure the plurality of light emitting element chips inside the transparent bulb" as

16  required by claims 1, 26, and 27 of the '734 Patent.  As described throughout

17  Nichia's Final Infringement Contentions, the LED filaments of the Accused

18  Products contain LED chips.  *See, e.g.*, A8-A23.  As further explained in Nichia's

19  Final Infringement Contentions, "the [LED] filaments [of the Accused Products

20  are] mounted within the bulb using support leads, thereby securing the LED chips."

21  See Page A33 of Exhibit A to Nichia's Final Infringement Contentions.  For

22  example, the support leads are attached to the metal plates in the Accused Products

23  and secure the LED filaments in place within the bulb:

24

25

26

27

28

1

G2560W/950CA/FIL/3(W):




support leads

See Page A33 of Exhibit A to Nichia's Final Infringement Contentions.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO.
20 (September 15, 2021):**

In addition to the foregoing, Nichia responds that its position remains that,
for each Accused Product, the support leads support or secure the one or more LED
filaments of the product (including the board, the LED chips mounted on the board,
and the yellowish wavelength conversion member that make up each LED filament)
inside the bulb.  The amount of support is that sufficient to "secure the plurality of
light emitting element chips inside the transparent bulb"; in the accused products,
this is enough support to hold the weight of an LED filament.  This support is
necessary for the device to effectively function.  Nichia provides in the enclosed
Appendix B, an explanation of the support function previously identified by Nichia
for the products charted in Nichia's Final Infringement Contentions.

| | |
|---|---|
| 1 | DATED: November 9, 2021 |

By: */s/ Mark T. Rawls*

SNELL & WILMER L.L.P

WILLIAM S. O'HARE (SBN 82562)
wohare@swlaw.com
ELIZABETH M. WELDON (SBN 223452)
eweldon@swlaw.com
600 Anton Blvd., Suite 1400
Costa Mesa, CA 92626
Telephone: (714) 427-7000
Facsimile: (714) 427-7799


ROTHWELL, FIGG, ERNST & MANBECK P.C.

ROBERT P. PARKER (*pro hac vice*)
rparker@rfem.com
MARTIN M. ZOLTICK (*pro hac vice*)
mzoltick@rfem.com
JENNY COLGATE (*pro hac vice*)
jcolgate@rfem.com
MICHAEL JONES (*pro hac vice*)
mjones@rfem.com
DANIEL R. MCCALLUM (*pro hac vice*)
dmccallum@rfem.com
MARK RAWLS (*pro hac vice*)
mrawls@rfem.com
D. LAWSON ALLEN (pro hac vice)
lallen@rfem.com
607 14th Street N.W., Suite 800
Washington, DC 20005
Telephone: (202) 783-6040
Facsimile: (202) 783-6031


*Attorneys for Plaintiff Nichia Corporation*

1  WILLIAM S. O'HARE (SBN 82562)
   wohare@swlaw.com
2  ELIZABETH M. WELDON (SBN 223452)
   eweldon@swlaw.com
3  SNELL & WILMER L.L.P.
   600 Anton Blvd., Suite 1400
4  Costa Mesa, CA  92626
   Telephone:  (714) 427-7000
5  Facsimile:   (714) 427-7799

6  ROBERT P. PARKER (*pro hac vice*)
   rparker@rfem.com
7  MARTIN M. ZOLTICK (*pro hac vice*)
   mzoltick@rfem.com
8  JENNY COLGATE (*pro hac vice*)
   jcolgate@rfem.com
9  MICHAEL JONES (*pro hac vice*)
   mjones@rfem.com
10 DANIEL R. MCCALLUM (*pro hac vice*)
   dmccallum@rfem.com
11 MARK RAWLS (*pro hac vice*)
   mrawls@rfem.com
12 D. LAWSON ALLEN (*pro hac vice*)
   lallen@rfem.com
13 Rothwell, Figg, Ernst & Manbeck P.C.
   607 14th Street N.W. – Suite 800
14 Washington, DC 20005
   Telephone:  (202) 783-6040
15 Facsimile:  (202) 783-6031

16 Attorneys for Plaintiff Nichia Corporation

17

18            **UNITED STATES DISTRICT COURT**

19       **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 20  NICHIA CORPORATION, | Case No. 2:20-cv-00359-GW-E |
| 21         Plaintiff | **NICHIA CORPORATION'S** |
| 22         v. | **VERIFICATION OF RESPONSES TO FEIT ELECTRIC CO., INC.'S** |
| 23  FEIT ELECTRIC COMPANY, INC., | **INTERROGATORIES NOS. 1-25** |
| 24         Defendant. | Judge:  Hon. George H. Wu |
| 25 | Magistrate Charles F. Eick |
| 26 | |
| 27 | |

28

1

## **VERIFICATION**

I, Kenji Matsumoto, declare and state as follows:

1.  I am the Deputy General Manager in the Legal Department of Nichia Corporation ("Nichia").  I am authorized to make this declaration on behalf of Nichia.
2.  I have read Nichia's responses to Feit Electric Co., Inc.'s Interrogatories Nos. 1-25 in this lawsuit, including the supplemental responses to the interrogatories (the "Responses").  Based on reasonable inquiry, and with the assistance of employees at Nichia, the facts set forth in the Responses are true and correct to the best of my knowledge, information, and belief.

     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Anan-Shi, Tokushima, Japan, on November 9th, 2021.

_____

1

2

## **CERTIFICATE OF SERVICE**

3

I hereby certify that on November 9, 2021, I electronically served the

document described as **PLAINTIFF NICHIA CORPORATION'S FOURTH**

4

**SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DEFENDANT**

5

**FEIT ELECTRIC COMPANY, INC.'S THIRD SET OF**

6

**INTERROGATORIES (NOS. 12-20)** on the following counsel of record:

7

8

Salil Bali
Matthew R. Stephens

9

**Stradling Yocca Carlson & Rauth, P.C.**

10

660 Newport Center Drive, Ste. 1600
Newport Beach, CA 92660

11

sbali@sycr.com

12

mstephens@sycr.com
Tel: 949-725-4000

13

14

Kal K. Shah
Katherine A. Smith

15

Simeon G. Papacostas

16

Mircea A. Tipescu

17

**Benesch, Friedlander, Coplan & Aronoff, LLC**
71 S. Wacker Drive, Ste. 1600

18

Chicago, IL 60606

19

kshah@beneschlaw.com
ksmith@beneschlaw.com

20

spapacostas@beneschlaw.com

21

mtipescu@beneschlaw.com
Tel: 312-212-4949

22

23

*Attorneys for Defendant Feit Electric Company, Inc.*

24

25

Dated: November 9, 2021

26

27

ROTHWELL FIGG ERNST & MANBECK, P.C.
By: */s/ Nasri V.B. Hage*

28

Nasri V.B. Hage

71