DAVID GURNICK (SBN 115723)
dgurnick@lewitthackman.com
JEFFREY A. KOBULNICK (SBN 228299)
jkobulnick@lewitthackman.com
JESSICA W. ROSEN (SBN 294923)
jrosen@lewitthackman.com
LEWITT, HACKMAN, SHAPIRO,
MARSHALL & HARLAN
16633 Ventura Boulevard Eleventh Floor
Encino, CA 91436
Telephone: (818) 990-2120
Facsimile: (818) 981-4764

ROBERT P. PARKER (*pro hac vice*)
rparker@rfem.com
MARTIN ZOLTICK (*pro hac vice*)
mzoltick@rfem.com
JENNY COLGATE (*pro hac vice*)
jcolgate@rfem.com
MICHAEL JONES (*pro hac vice*)
mjones@rfem.com
MARK RAWLS (*pro hac vice*)
mrawls@rfem.com
D. LAWSON ALLEN (*pro hac vice*)
lallen@rfem.com
NICOLE DEABRANTES (*pro hac vice*)
ndeabrantes@rfem.com
ROTHWELL, FIGG, ERNST & MANBECK P.C.
901 New York Avenue N.W., Suite 900 East
Washington, DC 20001
Telephone:  (202) 783-6040
Facsimile:   (202) 783-6031

Attorneys for Plaintiff Nichia Corporation

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICHIA CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>FEIT ELECTRIC COMPANY, INC.<br><br>Defendant. | Case No.  2:20-cv-00359-GW-E<br><br>***REDACTED***<br><br>**PLAINTIFF NICHIA CORPORATION'S OPPOSITION TO FEIT ELECTRIC COMPANY, INC.'S *DAUBERT* MOTION TO EXCLUDE CERTAIN PORTIONS OF THE EXPERT OPINIONS OF MR. MICHAEL GERSHOWITZ**<br><br>Hearing Date: September 29, 2022<br>Time:      8:30 a.m.<br>Ctrm:      9D |

# **TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................... 1

II.    BACKGROUND ........................................................................................ 1

    A.    Mr. Gershowitz's Experience and Expertise. ...................................... 1

    B.    Development of Testing Protocols......................................................... 2

    C.    The Nature of the Testing at Issue. ...................................................... 3

III.   ARGUMENT .............................................................................................. 4

    A.    Mr. Gershowitz Reliably Analyzed Whether the "Support Leads" of
the Accused Products Provide Support.................................................. 5

        i.    Mr. Gershowitz's opinions are reliable and relevant. ..................... 5

        ii.   Feit's arguments regarding "support leads" are based on unclaimed
features that did not require testing. ............................................. 8

        iii.  Mr. Gershowitz considered the requirements of "support leads." .. 9

    B.    Mr. Gershowitz's Testing Protocols Measured Light Passing Through
the Encapsulant and not Through the Sides of the Board.................... 11

        i.    Mr. Gershowitz's opinions regarding the encapsulant are reliable.
.................................................................................................... 11

        ii.   Feit's arguments are inconsistent with Mr. Gershowitz's actual
opinions, as well as the testimony of its own expert. ................. 14

        iii.  Feit's argument regarding lux measurement is misplaced. ........... 18

    C.    Mr. Gershowitz's Analysis of Feit's Proposed Non-Infringing
Alternatives was Complete. ............................................................... 19

        i.    Mr. Gershowitz provided a detailed analysis of the proposed non-
infringing alternatives............................................................... 19

        ii.   Feit's alleged alternatives are unclear, and Feit has improperly
identified new (and untimely) alleged alternatives. ................... 21

    D.    The Testing Utilized Standard and Reliable Testing Methodologies.. 23

1

IV.    CONCLUSION ..............................................................................................25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Daubert v. Merrell Dow Pharms.*,

   509 U.S. 579 (1993)................................................................1, 16, 25

*Fontem Ventures, B.V. v. NJOY, Inc.*,

   No. CV 14-1645-GW, 2015 WL 12743861 (C.D. Cal. Oct. 22, 2015) .......1, 8, 23

*Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*,

   87 F. Supp. 3d 928 (N.D. Cal. 2015)...................................................7, 8

*Kumho Tire Co. v. Carmichael*,

   526 U.S. 137 (1999).........................................................................25

*Primiano v. Cook*,

   598 F.3d 558 (9th Cir. 2010) ..................................................................1

*U.S. v. Guardioloa-Castillo*,

   2015 WL 736925 (M.D. Fla. 2015)........................................................19

*U.S. v. Sandoval-Mendoza*,

   472 F.3d 645 (9th Cir. 2006) ..................................................................1

1  Plaintiff Nichia Corporation ("Nichia") respectfully submits this opposition to
2  Feit Electric Company, Inc.'s ("Feit's") Motion to Exclude Portions of the Expert
3  Opinions of Mr. Michael Gershowitz (Dkt. 426).   Mr. Gershowitz is Nichia's
4  infringement expert.

5  **I.    INTRODUCTION**

6  Feit's motion should be denied in its entirety on either of two grounds.

7  *First,* the motion rests on an incomplete and incorrect portrayal of Mr.
8  Gershowitz's analysis, and the product testing that underlies his analysis.  Feit's
9  assertions that Mr. Gershowitz failed to consider relevant aspects of the accused
10  products and claims, or based his opinions on improper testing, are untrue.  As
11  explained below, Feit's arguments cannot be reconciled with the factual record.

12  *Second*, Feit's arguments go to Mr. Gershowitz's conclusions, and how he
13  applies the facts shown in the product testing, not to any objectionable testing or
14  methodology.  This is not a proper basis for a *Daubert* motion.  The factual basis of
15  an expert's opinion goes to credibility, not admissibility, and cross-examination and
16  presentation of evidence are how Feit must challenge Mr. Gershowitz's testimony.
17  *Daubert v. Merrell Dow Pharms*., 509 U.S. 579, 596 (1993); *Primiano v. Cook*, 598
18  F.3d 558, 564-65 (9th Cir. 2010) (quoting *U.S. v. Sandoval-Mendoza*, 472 F.3d 645
19  (9th Cir. 2006)) ("Under *Daubert*, the district judge is 'a gatekeeper, not a fact
20  finder.'"); *Fontem Ventures, B.V. v. NJOY, Inc.*, No. CV 14-1645-GW, 2015 WL
21  12743861, at *7, *15 (C.D. Cal. Oct. 22, 2015) ("[T]he sufficiency of his testing will
22  be subject to cross-examination by the defense and will be weighed by the jury….").

23  **II.    BACKGROUND**

24  **A. Mr. Gershowitz's Experience and Expertise.**

25  Feit does not challenge Mr. Gershowitz's credentials, or that he is well-
26  qualified to testify on infringement matters in this case.  Similarly, Feit does not
27  challenge that Mr. Gershowitz has the requisite experience and knowledge to select
28  appropriate tests to establish a particular feature of the claims.

1      Mr. Gershowitz earned both a bachelor's degree and a master's degree in

2    electrical engineering from Rensselaer Polytechnic Institute. Ex. 1, ¶ 12. [1]  He has

3    worked as an engineer for more than 35 years, with extensive experience in the field

4    of LED lighting.  *Id.*, ¶¶ 11-18.  This includes his tenure at Bridgelux, Inc., where he

5    prepared electrical, thermal, and optical guidelines for LED lightbulb design.  *Id.*,

6    ¶¶ 13-14.  Mr. Gershowitz is currently Vice President of Lighting and IoT Solutions

7    for Enlightened, and focuses on development of next generation product

8    requirements for advanced systems (*e.g.*, for large-scale lighting deployment).  *Id.*, ¶

9    21.  He is a named inventor on thirteen patents in the LED field.  *Id.*, ¶ 23.

10      Mr. Gershowitz is not only an expert in LED lighting products, he also has

11    significant experience testing LED lighting products.  For instance, he led the

12    photometric testing laboratory at Bridgelux, where he personally developed the

13    testing procedures and specified the equipment.  *Id.*, ¶¶ 14-15.  He is also certified

14    by the Lighting Research Center ("LRC") in photometry. *Id.*, ¶ 19.  Indeed, following

15    his departure from Bridgelux, he worked as a researcher at the LRC in the area of

16    LED measurement methodologies.  *Id.*, ¶ 20.

17      **B. Development of Testing Protocols.**

18      Nichia's testing expert, Mr. Michael Livingston, is a program manager at

19    Insight Analytical Laboratories, Inc. ("IAL").  Ex. A, ¶ 11-12; *see also* Ex. B, 19:5-

20    23:11 (summarizing IAL and Mr. Livingston's analysis work experience), 26:8-

21    27:17 (discussing examples of prior work).  Mr. Livingston directed and in some

22    cases personally performed the tests on the Accused Products in this case.  *See* Ex.

23    B, 48: 10:20, 49:19-50:2, 56:13-57:23, 137:7-14.  Mr. Gershowitz worked together

24    with Mr. Livingston to determine which tests to perform.  Ex. 1, ¶¶ 26-27 (Mr.

25    Gershowitz "discussed testing procedures with [IAL], visited IAL's facilities,

26    inspected IAL's equipment, and reviewed their operating procedures."); Ex. A, ¶ 18.

27    ─────────────

28    [1] Exhibits 1-16 refer to exhibits attached the Shah Declaration (Dkt. 428).  Exhibits
     A-Q refer to exhibits attached the Declaration of Michael H. Jones.

Mr. Livingston submitted an expert report that described the procedures used to test the Accused Products.  He also prepared 152 "Technical Analysis Reports," or "TARs," that show the results of those tests.  The TARs are part of Mr. Livingston's expert report.  *See* Ex. A, ¶¶ 18, 27, 64.   Feit has not challenged Mr. Livingston's expert report or the TARs, and they will be presented to the jury when Mr. Livingston testifies at trial.

The testing protocol "represents industry best practices for analyzing the types of LED products at issue in this case."  Ex. A, ¶ 26 ("[T]he protocol results in rigorous, trustworthy, and complete data with respect to the features being analyzed.").  Mr. Livingston explained during his deposition:

> [E]very test here, whether it's recording a photograph, performing … an element analysis, all of these are done with tools that have been in this industry for a very long time and the performance of those tests is well-documented and repeated by everybody to perform these tests.

Ex. B, 30:7-17; *see also id.* at 172:18-174:15.

In short, all testing of the Accused Products was performed reliably, at a dedicated testing facility, by personnel with specific training on how to perform the particular tests.  *See* Ex. B, 36:14-17, 38:12-25, 43:8-46:15, 47:4-20, 48:10-20, 49:19-50:2, 53:13-54:23, 56:13-57:23, 59:15-60:5.  Mr. Gershowitz inspected IAL's facilities, approved of (and helped select) the particular testing that was performed, participated in the testing process, and he used the results of IAL's testing in his report on infringement, and the results are a reliable basis for his opinions. *See, e.g.*, Ex. A, ¶ 18; Ex. 1, ¶ 27; Ex. 2, 122:21-25.

**C. The Nature of the Testing at Issue.**

The IAL testing that Mr. Gershowitz relied upon consists primarily of photographs of the Accused Products and their components.  This includes, for instance, images of the products in their "on" state, close-up views of various

components, and cross-sectional images of LED filaments. Some examples are provided below:

 

*See* Ex. C, 6-7. Optical imaging was performed using two microscopes—the Zeiss Discovery Stereo Microscope V20 and the Zeiss AxioImager M1m. *See* Ex. A, ¶¶ 53-55 (describing and showing imaging setup); Ex. B, 173:13-174:15 (confirming accuracy of microscopes).

Other types of testing include x-ray imaging to show the internal structure of components; spectrum analysis to measure the wavelength of light (*e.g.*, blue or yellow); Scanning Electron Microscope (SEM) imaging to obtain high magnification images; Energy Dispersive Spectroscopy (EDS) for material analysis (*e.g.*, to identify phosphor or resin), light transmittance measurements with an integrating sphere to measure transparency; and light intensity measurements with a lux meter to show light output in various directions. *See, e.g.*, Ex. 1, ¶¶ 105-107; Ex. A, ¶¶ 58-62; Ex. D, 7-57. All testing was performed by the appropriate personnel at IAL with the appropriate equipment and in accordance with manufacturer training. *See, e.g.*, Ex. B, 172:18-173:12.

## III.   ARGUMENT

As explained in detail below, the Gershowitz opinions that Feit challenges are relevant to infringement and are based on reliable testing. Feit's arguments to the contrary are unsupported and should be rejected.

**A. Mr. Gershowitz Reliably Analyzed Whether the "Support Leads" of the Accused Products Provide Support.**

The asserted claims of the patent-in suit require that the Accused Products have "support leads that secure the plurality of light emitting element chips inside the transparent bulb." *See* Dkt. 1-1 at 15:29-30. Feit argues that Mr. Gershowitz's opinions that the Accused Products have "support leads" are unreliable because he "ignored other support structures in the Accused Products" and did not "examine and rule out alternative explanations" Dkt. 426 at 3. Feit is wrong.

Mr. Gershowitz considered and analyzed extensive product testing and concluded that the alleged support leads in the Accused Products provide support sufficient to secure the LED chips inside the bulb (which is what the claims require). *See, e.g.*, Ex. E, 26-27, 42-43; Ex. 1, ¶ 211. As explained further below, both Mr. Gershowitz's methodology and his conclusions are sound, and he did consider what Feit refers to as "alternative support structures." Indeed, Feit's expert, Dr. Lebby, used the same methodology and testing data, and he reached the same conclusion—the alleged support leads provide at least some support because they support the board on which the LED chips are mounted. *See* Ex. F, 184:3-4, 253:13-24 (agreeing that they provide "indirect[]" support), 263:19-25, 269:5-19, 271:13-15 ("But I would agree with you, if you cut the wires, clearly you can remove the LED packages."). Dr. Lebby also bases his other opinions regarding support leads on the same methodology and testing data that Mr. Gershowitz uses. *See* Ex. G, pp. 57-59, ¶¶ 121-124. Thus, it is apparent that Feit's argument is not directed to the reliability of Mr. Gershowitz's methodology. Rather, the dispute is *what kind of support is required* by the claims, *i.e.*, whether it must be direct and exclusive support (as Feit contends) or if it includes indirect and non-exclusive support (as the '734 Patent teaches). This is a claim construction issue (*see* Dkt. 444, §IV(B)); it is not a basis for excluding Mr. Gershowitz's testimony.

i.    Mr. Gershowitz's opinions are reliable and relevant.

1       Mr. Gershowitz's testimony regarding "support leads" rests on a reliable

2  foundation of product testing, which demonstrates all relevant aspects of the support

3  leads in the Accused Products.  Feit is wrong that Mr. Gershowitz took "the position

4  that there is no difference between a lead and a support lead." Dkt. 426 at 4.[2]  Mr.

5  Gershowitz explained both during his deposition and in his report that, in addition to

6  being a *lead*, a support lead must provide *support.  See* Ex. H, 165:18-166:6, 250:22-

7  251:5; Ex. 1, ¶¶ 37, 211.  And he demonstrated that the support leads in the Accused

8  Products provide the support that is required.

9       Mr. Gershowitz explained how the testing shows that the support leads "secure

10  the plurality of light emitting element chips inside the transparent bulb."  Not only

11  did Mr. Gershowitz physically inspect the Accused Products, the images of the

12  products include views of the bulbs in different orientations, showing that the support

13  leads secure the LED filaments and corresponding LED chips inside the bulb even

14  when the bulb is rotated or moved about.  *See, e.g.*, Ex. E, 26-27.  This visual

15  inspection of the Accused Products demonstrates that the support leads provide the

16  required support.  As Mr. Gershowitz put it:  "The support leads are visible and can

17  be seen [in the photographs Mr. Gershowitz provided] securing the LED filament

18  (and the LED chips mounted thereon)." *Id.*

19       This was confirmed through further testing.  The support leads were cut, with

20  the result that the filaments (and the LED chips in the filaments) became unsecured.

21  That is, without the identified support leads in place, the LED chips were no longer

22  secured inside the transparent bulb, indicating that the support leads provide the

23  support required by the claims.  *See, e.g.*, Ex. E, 26 (explaining that the first

24  photograph shows "the LED filaments secured by the support leads," and the second

25  shows "the LED filaments removed from the filament assembly"); Ex. 1, ¶211.  This

26

27  [2] Feit filed a motion for partial summary based on the "support leads" of the
Accused Products.  Dtk. 433.  Nichia's opposition, which is filed concurrently with

28  this, addresses many of the same arguments.

NICHIA'S OPPOSITION TO FEIT'S *DAUBERT* MOTION DIRECTED TO MR. MICHAEL GERSHOWITZ

6

testing is illustrated below with an exemplary product:



(secured)                    support
                             leads cut

                             (unsecured)

Ex. C, 7; Ex. E, 4-5, 26-27.  All of the claim charts in Mr. Gershowitz's report cite

similar testing; the filaments of all of the products were unsecured after the support

leads were cut.  *See, e.g.*, Exs. D, I-K.  Mr. Gershowitz thus did not "start[] and end[]

with his identification of leads without further analysis," as Feit suggests.  Dkt. 426

at 5.  Rather, he analyzed the available product testing to show how the leads provide

support.

This testing provides a reliable basis for Mr. Gershowitz's testimony.  For

instance, based on this testing, Mr. Gershowitz explained:

> The support leads support the one or more LED filaments within the
> bulb. *Without the support leads, the one or more LED filaments would
> be left to float about in the bulb without any connection*…. The support
> leads hold the one or more LED filaments within the bulb. By doing so,
> *the support leads therefore support the LED chips* that are mounted on
> a board within the LED filaments."

Ex. 1, ¶ 211 (emphasis added); *see also* Ex. B, 119:22-23.

To the extent Feit takes issue with Mr. Gershowitz's reliance on visual and

manual inspection for testing if the alleged support leads provide support, the ruling

in *Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*, 87 F. Supp. 3d 928, 940

(N.D. Cal. 2015), is informative and on-point.  There, the court found it was

"common sense" that "visual and manual inspection would be one acceptable way …

1  to assess the structural characteristics" of products. *Id.* (citation and quotation marks

2  omitted).    As this Court explained in another case, it is "clear that a patent

3  infringement expert's opinions as to certain uncomplicated elements can be based on

4  a visual inspection and operation of the accused products, as well as the expert's

5  knowledge, skill, experience, and education." *Fontem Ventures*, 2015 WL 12743861,

6  at *7. Moreover, as noted above, Dr. Lebby made use of the same methodology. *See*

7  Ex. G, pp. 57-59, ¶¶ 121-124.

8      For these reasons, Mr. Gershowitz's opinions have a reliable foundation and

9  are relevant to issue of infringement. Feit may dispute Mr. Gershowitz's ultimate

10  conclusion (that the Accused Products have support leads), but that is not a proper

11  basis for a *Daubert* motion.

12          ii.    <u>Feit's remaining arguments regarding "support leads" are based</u>
13                 <u>on unclaimed features that did not require testing.</u>

14      Feit raises two additional points: (1) that Mr. Gershowitz was required to test

15  for "rigidity" of the support leads, and (2) that Mr. Gershowitz failed to demonstrate

16  that the support leads of the accused products provide exclusive support. Dkt. 426 at

17  3-6. But the claims do not require either a specific rigidity value or exclusive support.

18      With respect to rigidity, Feit improperly confuses testing for whether a

19  structure provides support with testing for whether the structure is rigid. *Id.* at 4. As

20  Mr. Gershowitz correctly testified, the claims do not require a particular rigidity

21  value.    *See* Ex. H, 178:15-25. ("[T]here's no claim limitation that deals with

22  rigidity."). Nor does Feit assert that the claims require a particular level of rigidity,

23  nor could it—the claims are silent on that point. In contrast, the claims expressly

24  state the "support" that is required – the support leads must "secure" the chips inside

25  the bulb.    At most, Feit implies that support leads require certain "structural

26  properties," but Feit never says what those structural properties are. Dkt. 426 at 4-5.

27      With respect to exclusive support, Feit argues that other structures in the

28  Accused Products besides the support leads may provide some support. *Id.* at 3-6

1    (identifying "stems and hubs, non-lead metal structures, and rigid hollow tubes").

2    The fact that some products have additional structures is irrelevant.  The claim does

3    not require "exclusive" support, so the fact that other structures may also provide

4    support is of no moment.  Mr. Gershowitz correctly understood this.  *See, e.g.*, Ex.

5    H, 191:10-17 ("As the support leads as I've identified them were sufficient to

6    demonstrate meeting the limitations of the claim and prove infringement, the

7    additional structure you're pointing to here was not a part of my analysis because it

8    would not [undo] the infringement that already occurred by the support leads as I've

9    identified them."), 192:11-20, 194:10-20.

10    Feit contends that Mr. Gershowitz "ignored" the other structures in the

11    Accused Products.  *See, e.g.*, Dkt. 426 at 3-5.  Feit is wrong on this point as well.  Mr.

12    Gershowitz did not fail to consider "alternative explanations," or ignore other

13    structures, as Feit asserts.  As Mr. Gershowitz noted in his expert report and the

14    accompanying claim charts, he considered other structures, but nonetheless

15    concluded that the leads provide support based on his analysis of the testing,

16    including visual inspection and cutting of the leads, as discussed above.  *See, e.g.*,

17    Ex. 1, ¶ 211 (explaining that support leads in Accused Products provide support even

18    if the product "ha[s] *additional members* [what Feit calls 'non-lead metal structures'

19    in its motion] that help to shape the spiral-like configuration of the LED filaments")

20    (emphasis added); Ex. E, 4 ("The filament assembly annotated above includes four

21    LED filaments that are connected to a stem (or a cylindrical post extending from the

22    base) [what Feit calls 'stems and hubs' in its motion] via support leads.  See claim

23    element 1.5 (explaining how support leads secure the LED filaments within the

24    bulb)."); Ex. J, 4 (same).

25    In sum, Mr. Gershowitz's analysis provides reliable, probative, and abundant

26    evidence that the leads provide support.

27           iii.     <u>Mr. Gershowitz considered the requirements of "support leads."</u>

28    As explained above, Feit is wrong when it says that "Gershowitz takes the

position that there is no difference between a lead and a support lead" – suggesting that Mr. Gershowitz did not consider, at all, the requirement that support leads provide support. Dkt. 426 at 4.    Feit bases its arguments on a distortion of Mr. Gershowitz's deposition testimony.  *See id.*    Mr. Gershowitz was asked his understanding of the term "support leads" as used in claim 1 of the '734 Patent.  After reading the relevant claim language, he responded:  "So the *support leads are doing both [the] function* of securing the plurality of LED-emitting chips inside the transparent bulb, *as well as* electrically connecting the metal plates to … the base via these same support leads."  Ex. H, 165:18-166:6 (emphasis added).  He was then asked what distinction he makes between "lead" and "support lead," and he responded by saying, "I did not mean to make any distinction.  If I said lead and not support lead, [then] I apologize for not more carefully referring to the language of the patent."  *Id.*, 166:7-13.  In other words, Mr. Gershowitz's testimony confirmed that, if he had previously referred to a "lead," he meant "support lead."  He consistently explained his position that support leads provide both electrical connection and support. *See, e.g.*, *id.*, 167:2-9.

Indeed, Mr. Gershowitz was specifically asked what he meant when he said there was "no difference" between leads and support leads and he said:

> In all of the infringing products, the leads of the infringing products *both provide support and provide electrical connection*.  So therefore, whether you consider them support leads or you consider them leads for all of these infringing products, it still remains providing both support and providing electrical connection.

*Id.*, 250:22-251:5 (emphasis added).[3]

_____

[3] Mr. Gershowitz also testified that all of the leads in the '734 Patent are support leads.  *See* Ex. H, 166:22-24 ("As it pertains to the '7[34] patent, there is no distinction between the term 'lead' and 'support lead.'"), 250:16-21 ("[T]his was all in the context of the '734 patent").  And he is correct—all of the leads disclosed in the '734 Patent are support leads.

In sum, Mr. Gershowitz analyzed the Accused Products with the understanding that a "support lead" must provide support in addition to being a lead, and demonstrated that support in the Accused Products through reliable methodology.

**B. Mr. Gershowitz's Testing Protocols Measured Light Passing Through the Encapsulant and not Through the Sides of the Board.**

The claims require "a wavelength conversion member formed unitarily with a transparent member." Dkt. 1-1 at 15:24-25. The Court construed this term to mean "a single component that both converts wavelength and allows light to pass through." Dkt. No. 90 at 18. This component is typically referred to as the "encapsulant." *See* Ex. F, 56:4-21. This section focuses on the second aspect of this construction ("allows light to pass through"). Specifically, Feit argues that Mr. Gershowitz failed to "account for light escaping through" exposed sections of the board rather than passing through the "encapsulant." Dkt. 426 at 6-12. Feit is wrong.[4]

In plain words, Feit's argument is that the testing does not show that blue light passes *through the encapsulant*, but might pass exclusively out of uncovered sides of the board. *See, e.g.*, *id.* at 8 ("Gershowitz did not assess whether, if there was light passing through, it was passing through from the exposed band…."). Feit's argument is incorrect, and also belied by the testimony of its own technical expert Dr. Lebby. Dr. Lebby looked at the same tests as Mr. Gershowitz and came to the very same conclusion—blue light from the LEDs is passing through the encapsulant, just as Mr. Gershowitz explained. Ex. F, 367:12-369:2, 370:21-371:8. Again, *Feit is moving to exclude testimony that its own expert agrees with*.

i. Mr. Gershowitz's opinions regarding the encapsulant are reliable.

Mr. Gershowitz analyzed the encapsulant to show that it "allows light to pass through," and his testimony rests on a reliable foundation, including photographs,

---

[4] This part of Feit's motion is limited to a subset of products having an exposed section of the board uncovered by the encapsulant. This does not relate to Feit's Model 72007, on which Nichia's pending motion for summary judgment is based.

spectral testing, material testing, product information, and admissions from Feit. *See, e.g.*, Ex. E, 12-22 (analyzing the evidence and concluding "[a]ll of this evidence cumulatively indicates" that the encapsulant "allows some of the blue light emitted by the LEDs to pass through"). Specifically, the testing and other evidence show that blue light from the LED chips passes through the encapsulant. Indeed, Feit's expert considered the same evidence to conclude that the encapsulant "will *certainly, definitely* convert wavelength *and allow light to pass through*." Ex. F, 367:12-368:9 (emphasis added) (explaining that blue light passes through the encapsulant of a product with exposed edges of the board). Given that both experts found the testing sufficiently reliable to reach their conclusions (the same conclusion) about this claim feature, there is no basis to exclude Mr. Gershowitz's testimony.

The claimed features are also readily apparent, for instance, from visual inspection of the filaments with the encapsulant removed (showing blue light) and the encapsulant present (showing white light). An example is shown below:



Ex. C, 9-10. In the lower of the two images above, the white squares correspond to the blue LED chips under the encapsulant. The fact that these squares are white means that the blue light seen in the upper picture is passing through the encapsulant in the regions above the chips, and not out the sides of the board. When asked whether he could "tell visually if any light is passing through" the encapsulant, Mr. Gershowitz responded "most certainly." Ex. H, 139:25-141:2. He explained that the conclusion follows because "one can clearly see the white rectangles or squares which correspond to the physical location of the LED die." *Id*. Those white regions result from "the mixing of the blue light from the LED die" that passes through the encapsulant with "yellow [light] which is down-converted by the phosphor." *Id*.

Indeed, blue light passing from the LED chips into the encapsulant is actually visible in close-up images of the LED chip and encapsulant:



Ex. C, 16.  Contrary to Feit's suggestion (raised in a footnote on page 7 of its motion), there is no dispute that (1) the source of the light is blue LED chips under the encapsulant, or (2) the white light of the Accused Products is the result of blue light from the LED chips mixing with phosphor-converted yellow light.  *See, e.g.*, Ex. L at Response to RFA No. 2 (citing Dkt. 112-45); Ex. F, 367:12-368:9.

Although the points discussed above are sufficient, material testing also confirms that Mr. Gershowitz's opinions have a reliable factual basis.  EDS testing shows that the encapsulant is a mixture of phosphor and silicone resin, which is a well-known transparent resin that allows light to pass through.  *See* Ex. E, 20.

Likewise, spectral testing of the light output from the filament further supports Mr. Gershowitz's opinions.  This testing shows that both blue and yellow light are passing through encapsulant.  *See id.*, 13-15 (charts plotting the measured emission of blue and yellow light).  The spectral power distribution (SPD) plot was obtained with a spectral measurement tool located above the filament, and thus, necessarily measured light passing through the encapsulant and not light that may have escaped from uncovered sides (which would continue in a straight line out the sides and not be detected by the measurement tool above the filament).  *See* Ex. B, 149:4-151:5; Ex. H, 142:19-147:17 (explaining that "light has passed through this yellow member to go from the die to the detector").

Mr. Gershowitz based his analysis on these test result, and explained how the testing accounted for whether the measured light output was escaping from the sides

of the board. *See id*. As Mr. Gershowitz explained, the testing and analysis ruled out the possibility that the observed light output was anything other than blue light from the LEDs chips passing through the resin-phosphor mixture of the encapsulant. *See id*. at 149:5-150:3 ("So therefore, the light that is impinging on the detector would be the vast majority of that light. The measurable portion of that light would be light that came from the top surface and the light from the side would be effectively either unmeasurable or in the noise floor because of the way the apparatus is arranged."); *id*. 142:16-143:24 (further explaining that based on "knowledge that the only light source in the filament is a blue light source combined with the knowledge from physics that light will travel in a straight line" allows him to "deduce with certainty" where the blue light that is measured by the device comes from).

With the foregoing results in hand, Mr. Gershowitz reliably demonstrated that the encapsulant converts wavelength (undisputed) and "allows light to pass through." That is what the claims require, and is sufficient to show that the Accused Products meet this element. Whether, in addition to this, some light *also* passes out of uncovered sides is irrelevant. The claim does not require that *all* light pass through (nor could it, because some light must be converted blue light, to mix with the unconverted yellow light to create the desired output color).

In sum, Feit's arguments on this point are wrong. Regardless, as explained in the next section, Mr. Gershowitz did analyze whether light may also be escaping through uncovered sections of the board, and Feit's challenge to Mr. Gershowitz's testimony is groundless.

> ii.  Feit's arguments are inconsistent with Mr. Gershowitz's actual opinions, as well as the testimony of its own expert.

Feit's two remaining contentions are also incorrect.

First, Feit argues that Mr. Gershowitz did not "consider[] the actual light output of the bulbs in operation," implying that Mr. Gershowitz's opinions are based exclusively on photographs. Dkt. 426 at 6-7. This is not true. *See* discussion supra,

Section III(B)(i) (summarizing testing for this claim feature). Mr. Gershowitz relies
on different sources of evidence – including light spectroscopy measurements of "the
actual light output of the bulbs in operation" – that, in his view, "cumulatively
indicate[]" the presence of the disputed claim limitation. Ex. E, 20. Feit attacks a
subset of these sources in isolation, but does not consider Mr. Gershowitz's reference
to the materials in combination.

Feit's arguments regarding particular evidence are also misplaced. As
explained above, visual inspection of the filaments in their "on" state demonstrates
that blue light is passing through the encapsulant. Feit suggests that Mr. Gershowitz
"conceded" that the photographs are irrelevant because he stated with respect to one
photograph that "[b]y observation of this photograph alone, I would not be able to
know" whether blue light passes through the encapsulant. *See* Dkt. 426 at 7.
However, Mr. Gershowitz merely noted that one of the photographs did not by itself
clearly show the claimed feature. But Mr. Gershowitz did not base his opinion on
that one photograph in isolation, and in fact, just before the quoted statement, Mr.
Gershowitz explained how other photographs (such as those described above, in
Section III(B)(i)) show the claimed features. *See* Ex. H, 139:25-141:2. Additionally,
just after the quoted statement, Mr. Gershowitz also explains other testing that
demonstrates blue light passing through the encapsulant. *See id.*, 142:1-144:6.

Feit says it is "troubl[ed]" that Mr. Gershowitz did not take photos of the
Accused Products himself, and raises issues from discretion of camera lens to
photograph parameters that were not recorded. Dkt. 426 at 7. Feit offers no evidence
that any of the photographs is unreliable – on the contrary, they corroborate the other
evidence Mr. Gershowitz relied on. Moreover, there is nothing "troubling" about
using a dedicated testing facility with highly trained personnel to photograph the
Accused Products.

On that point, Feit's attacks on Mr. Livingston's photography are also
meritless. Feit complains that Mr. Livingston relied on "numerous technicians."

There were three that did almost all the work, and a fourth occasionally helped.  Ex. B, 53:2-12.  Feit complains "no effort was made to ensure the technicians were consistent in methodology."  Not so.  Each was trained and exercised discretion based on their training, such as selecting an appropriate lens depending on whether the bulb was 2cm in diameter or 20cm in diameter.  *Id.*, 72:5-73:1.  And Mr. Livingston properly supervised the testing at IAL's facilities, including reviewing the results and holding daily team meetings.  *Id.*, 56:13-23, 59:15-60:5.  Tellingly, Feit challenges neither Mr. Livingston's report nor the photographs included in his reports.  Nor is there testimony from Feit's expert (or anyone else) that the "photograph parameters" Feit identifies have any relevant bearing on the images in this case.  To the contrary, Mr. Livingston said, "In a case like a top-down photograph, they are not relevant so we don't record that."  *See id.*, 46:16-47:3.  Feit's arguments with respect to photographs should be rejected.  At most, this is a topic for cross-examination, and not exclusion.  *See Daubert*, 509 U.S. at 596.

Second, Feit argues that the spectral power distribution (SPD) testing "did not account for light escaping from large bands of exposed board in each filament."  Dkt. 426 at 7-11.  This is also untrue.  Mr. Gershowitz testified multiple times to the contrary – as he explained, he could deduce with certainty (based on his knowledge of the products, the testing setup, and basic physics) that light impinging on the detector was coming through the encapsulant and not from bands of exposed board in the filament.  *See* Ex. H, 142:19-151:7.  Moreover, in his report, Mr. Gershowitz specifically addressed the possibility that light may pass through the sides of the board, explaining that the amount of light escaping through the sides "is not a significant amount of light relative to the total light emitted…."  Ex. E, 36-37.  Feit's assertion that Mr. Gershowitz "did not account" for light through the sides of the board is untrue and contrary to the record.

Feit's motion emphasizes the ideas that the testing equipment does not "understand[] the direction of light," and relatedly, that there was no testing for

"density."  *See* Dkt. 426 at 9-11.  Both points miss the mark.  As to "direction," the key is that Mr. Gershowitz understands the direction of light—the measurement was taken from above the filament, and the light travels in a straight line from the encapsulant to reach the measurement tool.  *See* Ex. H, 142:19-151:7.  Because of this, "the light from the side would be effectively either unmeasurable or in the noise floor because of the way the apparatus is arranged." *Id.*, 150:1-3.  Feit mischaracterizes this testimony as suggesting that light passing through the sides of the board would be indicated in the SPD plots (Dkt. 426 at 10), but Mr. Gershowitz said the opposite (Ex. H, 150:1-3).  Based on this misunderstanding, Feit argues that an alternative explanation of the measurements is that the blue light comes exclusively from light exiting the sides of the board, and that a high density of phosphor could prevent light escaping through the encapsulant.  Dkt. 426 at 10.  But this explanation does not take into account all the testing Mr. Gershowitz analyzed, as explained above, which demonstrates light passing through the encapsulant.  Not even Feit's expert agrees with this theory, as he admitted unequivocally that light "passes through the encapsulant."  Ex. F, 367:12-369:2.

Specifically, Feit's expert, Dr. Lebby, was asked about the following product, which has edges of the board exposed, just like the example in Feit's Motion:



Ex. C, 16; *compare* Dkt. 426 at 8; Ex. F, 366:19-24.  When asked how "this product make[s] white light," Dr. Lebby explained that "the majority of light that exits" the LED chip "will go in the upper wavelength conversion member which is the single component that is colored yellowy color":

1     And in that, as per the Court's construction, *that single component will*
2     *certainly, definitely convert a wavelength and allow light to pass*
3     *through*. So the mixture of the *blue light that passes through that*
4     *organic material* [i.e., the encapsulant] and the blue light that enters the
5     phosphor granules that gets converted to yellow will mix and create
6     white light….

7 Ex. F, 367:12-369:2 (emphasis added), 370:21-371:8 (acknowledging that the upper

8 encapsulant allows light to pass through).  That is, Dr. Lebby agreed that, even if

9 some blue light is escaping from the uncovered sides, "certainly, definitely" blue

10 light is passing through the encapsulant, which is "a single component that both

11 converts wavelength and allows light to pass through." *Id.*

12     If Feit's expert can reach the same conclusion as Mr. Gershowitz from the

13 same set of materials, there is no reasonable basis to conclude that Mr. Gershowitz's

14 testimony, or the testing on which he basis his conclusions, is unreliable.

15           iii.    Feit's argument regarding lux measurement is misplaced.

16     Finally, Feit asserts that lux (light output) measurements made with a handheld

17 spectrometer were "potentially faulty."  Dkt. 426 at 11-12.  Feit's arguments are

18 based on a misunderstanding of these tests.  According to Feit, Mr. Gershowitz used

19 the lux measurements to test whether blue light was passing through the encapsulant.

20 *Id.*  That is incorrect; Mr. Gershowitz relied on these tests for claim element 1.8 as it

21 relates to his argument on the doctrine of equivalents, not claim element 1.3.  *See,*

22 *e.g.*, Ex. E, 35 (analysis of claim element 1.8).

23     Moreover, questions such as this go to the weight, not admissibility of

24 evidence.  Feit's motion introduces new evidence suggesting that the spectrometer

25 used for these tests should be calibrated "depending on operating conditions."  Ex.

26 10.  Feit did not raise this issue during expert discovery, and it can cross-examine

27 Mr. Livingston at trial about whether the operating conditions at IAL warranted

28 calibration. *See, e.g.*, *U.S. v. Guardioloa-Castillo*, 2015 WL 736925, *4 (M.D. Fla.

2015) (holding that calibration question "goes to the weight of the evidence and not
the admissibility and may be addressed on cross-examination").

## C. Mr. Gershowitz's Analysis of Feit's Proposed Non-Infringing Alternatives was Complete.

Feit's arguments with respect to the proposed non-infringing alternatives
ignore the full scope of Mr. Gershowitz's testimony, and ignore that Feit's proposed
alternatives are unclear and incomplete hypotheticals.

As a preliminary matter, however, Feit's arguments are untethered to its
requested relief.   For instance, while Feit addresses only a portion of Mr.
Gershowitz's testimony on this issue, it seeks to strike all of his testimony.[5]  Dkt. 426
at 12-14.  Notably, Feit goes so far as to claim Mr. Gershowitz did not "provide *any*
infringement analysis of Feit Electric's proposed alternative designs." *Id.* at 16
(emphasis added). This is untrue and contradicted by the 46 paragraphs of Mr.
Gershowitz's report analyzing infringement with respect to the proposed "design
arounds." *See* Ex. 1, ¶¶ 252-297.

i.    Mr. Gershowitz provided a detailed analysis of the proposed non-infringing alternatives.

Even for the alternatives Feit does address in its motion, Feit gets it wrong.
Mr. Gershowitz's analysis is more than adequate.

For example, with respect to alternative designs having "conductors or
terminals substituted for metal plates," "multiple resin structures or a break in the
resin structure or multiple structures that do not surround the board," and/or "'leads
as opposed to 'support leads,'" Feit argues that Mr. Gershowitz's opinions "do not
actually provide *any analysis*." Dkt. 426 at 13-14 (emphasis added).  This is untrue,
and excerpts of Mr. Gershowitz's analysis are provided below:

---

[5] Mr. Gershowitz provided a thorough analysis, addressing eighteen (18) different
proposed alternatives in his report.  Ex. 1, ¶¶ 252-297.  Feit's motion addresses only
six (6) of the alternatives Mr. Gershowitz analyzed. *See* Dkt. 426 at 12-14.  The
motion can be denied, at least in part, for this reason alone.

- Mr. Gershowitz explained that "[a] metal plate may be a conductor, and act as a terminal.  Thus, and as noted in Nichia's response to Interrogatory No. 23, to the extent a pair of metal plates are substituted for another pair of metal plates, this design would still infringe.  The size of the metal plates do not impact the infringement analysis, so to the extent that … a pair of metal plates are used, the size of those plates do not make the design non-infringing."  Ex. 1, ¶ 277.

- Mr. Gershowitz stated that for "resin structures where the resin of the wavelength conversion member does not fully surround the board on all sides, such a design would still infringe the claims for the reasons I have already explained."  *Id.*, ¶ 288.    Indeed, Mr. Gershowitz's devotes *entire sections* of his report to demonstrating why such structures infringe, both literally and under the doctrine of equivalents.  *See id.*, Sections X(A)(3)(h), X(B), X(D).

- Mr. Gershowitz explained that "[t]he composition of the support leads, and whether the support leads have one or more layers, are not specified in the claims, and not material to the infringement analysis.  That is, changing the existing support leads in the Accused Products (*i.e.*, 'as in the current case') to a two-layer structure as suggested by Feit would not make them non-infringing.  They would still be support leads." *Id.*, ¶ 274.  Mr. Gershowitz also referred to another section of his report where he addressed Feit's arguments on this issue.  *Id.* (citing Section X(F)(1)(d) of his report).

In short, Feit's arguments regarding purported gaps in Mr. Gershowitz's analysis have no basis in Mr. Gershowitz's actual testimony.

Feit also states that it proposed "the use of alternate wavelength conversion members disclosed in the '734 Patent but not claimed."  Dkt. 426 at 13.  But Feit did not propose *replacing* any structure of the Accused Products with another.  *See* Ex. M, 9-11.  Likewise, Feit did not suggest that any component would be removed, nor did it provide a complete explanation of how it proposed to implement the "alternate

wavelength conversion members." *Id.*[6]  As such, Mr. Gershowitz's analysis was correct:  "Provided there is at least one wavelength conversion member formed unitarily with a transparent member, the presence of additional members as described in Feit's proposed design-arounds does not undo infringement." Ex. 1, ¶¶ 291-293. *See, e.g.*, *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 405, 1371-72 (Fed. Cir. 2005) (the inclusion of unclaimed elements does not preclude infringement).  Mr. Gershowitz's response does not reflect "intentional ignorance" (Dkt. 426 at 13), but rather reflects the incomplete, truncated description of the proposed "design around."[7] For any of these reasons, Feit's motion should be denied.

ii.    Feit's alleged alternatives are unclear, and Feit has improperly identified new (and untimely) alleged alternatives.

Feit contends that Mr. Gershowitz's non-infringement analysis failed to address the designs that Feit proposed as alternatives.  Dtk. 426 at 12-13.  However, any apparent difference between the alternatives Feit *thinks* it identified and Mr. Gershowitz's non-infringement analysis are a result of Feit's unclear and incomplete identification of "alternatives."  Indeed, most of Feit's alleged alternatives are just terse hypotheticals.[8]  Mr. Gershowitz  analyzed the alternatives that Feit proposed as best he could, given that (1) they are partial hypotheticals and not actual designs; and

---

[6] Contrary to its current descriptions, the proposed design arounds were not linked to the patent, let alone specific figures in the patent. *Compare* Dkt. 426 at 12-13 *with* Ex. M, 9-11.

[7] The only other design around actually identified in the motion is "a yellow board and a resin used on only one side of the board." *See* Dkt. 426 at 13. As Mr. Gershowitz, noted, this is an incomplete proposal because it does not describe "the relative placement of the components (e.g., the type and placement of the resin relative to the light emitting element chips)." Ex. 1, ¶ 290.

[8] The only exceptions are the "alternatives" that are also Accused Products.  But for the reasons discussed in Nichia's motion for summary judgment, these product designs should not be considered "alternatives." *See* Dkts. 416, 443 at 24 (citing *Webasto Thermo & Comfort N.A., Inc. v. Bestop, Inc.*, No. 16-cv-13456, 2019 WL 3334563, *4 (E.D. Mich. July 25, 2019)).

(2) Feit has failed to articulate a basis for why they allegedly do not infringe. *See* Ex. 1, ¶¶ 255-297; Ex. M, 9-11.

Context is important here. During discovery, Nichia asked Feit for its list of alleged non-infringing alternatives. Ex. Ex. M, 9-11. Feit responded. It did not identify specific products on the market, or provide descriptions of complete lightbulb designs. *Id.* Rather, Feit offered one-sentence (or partial sentence) statements – *e.g.,* referring to a product that does "not" have a particular claim element, or providing a single phrase in isolation to describe a partial design idea. *See, e.g.*, *id*. at 11 ("Leads that do not cross metal plates") ("A board that is covered by a reflective layer") ("Packaged LEDs"). Nichia identified these deficiencies during discovery, explaining that "the Feit designs are incomplete hypotheticals," "vague," "unclear," and that "Nichia does not understand Feit's proposed design." Ex. N at 2-8. Feit did not supplement its list to provide more detail. Mr. Gershowitz noted these same deficiencies in his report. *See* Ex. 1, ¶ 257.

. Thus, in view of these deficiencies, Mr. Gershowitz can hardly be blamed for any inconsistency between the alternatives Feit *thinks* it identified and the designs for which Mr. Gershowitz analyzed non-infringement. Moreover, Feit – not Nichia or Mr. Gershowitz – should bear any consequences that result from Feit's sparse descriptions of alleged alternatives.

Feit also improperly expanded upon its identification or description of its alleged non-infringing alternatives in its motion. For example, for the first time in its motion, Feit has alleged that disclosures in the '734 Patent are purportedly examples of its alleged alternatives. Dkt. 426 at 12-13. Previously, none of Feit's alleged alternatives were linked to disclosures in the asserted patent. Ex. M, 9-11; Ex. Q, 28-30. It is simply too late for Feit to identify new alternatives (or embellish

prior alternatives) now.  As such, Feit's challenge to Mr. Gershowitz's opinions based on these untimely-identified "alternatives", or any lack of opinions by Mr. Gershowitz on alternatives that Feit previously had not disclosed, should be disregarded.  Moreover, for the reasons explained in Nichia's co-pending motion, Feit should be precluded from addressing alternatives that were not timely disclosed during discovery.  Dkt. 425, 445 at Section II(C).

Finally, Feit's reliance on *Fontem Ventures* is misplaced.  *See* Dkt. 426 13-14.  In *Fontem*, the expert elected not to study the accused products, and thus, could not opine on whether they infringed or not.  *See Fontem Ventures*, 2015 WL 12743861, at *8-9.  However, here, there were no alternative products for Mr. Gershowitz to study.  Feit offered no products or product designs, and Mr. Gershowitz was left to consider only Feit's unclear and incomplete descriptions.

### D. The Testing Utilized Standard and Reliable Testing Methodologies.

Feit's motion concludes with the sweeping argument that Mr. Gershowitz's "entire opinion on infringement" should be excluded because his testing methodologies were allegedly unrecognized or unreliable.  Dkt. 426 at 14-16.  This argument fails for at least three reasons.

First, Feit does not challenge the report and testimony of Nichia's testing expert, Mr. Livingston, under *Daubert* or otherwise.  Thus, his report – along with all of his test results – will come into the record when he testifies at trial.  This underscores the fact that Feit's true disputes are with Mr. Gershowitz's conclusions, and not the testing methodology.

Second, as explained above, the testing was reliable.  *See, e.g.*, Section III(B).  All of the testing was performed by trained personnel, under Mr. Livingston's expert supervision, and in accordance with the equipment manufacturers' recommendations.  *See id.*  Mr. Livingston explained that the testing "represents industry best practices for analyzing the types of LED products at issue in this case."  Ex. A, ¶ 26.  The tests were standard tests, common in the industry.  *See* Ex. B, 30:7-

17 ("[E]very test here, whether it's recording a photograph, performing … an element analysis, all of these are done with tools that have been in this industry for a very long time and the performance of those tests is well-documented and repeated by everybody…."); Ex. 1, ¶ 110 ("[I]t is my opinion that the IAL Technical Analysis Reports contain the methodologies or tests suitable and appropriate for determining whether the elements of the asserted claims, including a wavelength conversion member formed unitarily with a transparent member, are present."). Feit presents no expert testimony to the contrary.

Moreover, as discussed above, Feit's expert, Dr. Lebby, confirmed that he relied on the very same testing Feit now argues is unreliable. *See* Ex. G, ¶ 51 ("In forming my opinions and conclusions regarding non-infringement, I have relied on the information set forth in the IAL Technical Analysis Reports…."). Dr. Lebby questioned Mr. Livingston's execution of the testing protocol (e.g., whether there was adequate supervision or calibration), but he did not question the scientific basis for the tests, or suggest that the testing methodologies would not be accepted in the LED lighting community. Ex. G, pp. 16-24, ¶¶ 55-70. Dr. Lebby did not suggest that the results of any test were invalid. *See id*. In fact, Dr. Lebby's confirmation of the testing protocols was to be expected – it cannot credibly be argued, for instance, that "photography" is a new test that "was developed for the purpose of this litigation, and not based on approved scientific methods." *See* Dkt. 426 at 16.

Third, Feit confuses the *set* of tests employed by IAL (referred to as the "protocol" by Mr. Livingston) with the *individual* tests that were performed at each stage. It is true that the selection of certain tests "was for the purpose of this litigation" (*see* Dkt. 426 at 16), but IAL did not develop any new test or methodology. In this respect, Feit's cases are inapposite. Moreover, it is unsurprising that there is no published, standardized group of tests to show every element of the asserted claims of the '734 Patent. And Feit has identified no precedent suggesting that plaintiffs must find journal articles or trade publications outlining which tests best

align with particular elements of a claim. As discussed above, each of the individual tests performed by IAL was a reliable test, and Feit has no evidence to the contrary. While it is true that a "judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable," Feit takes far too rigid a view of this requirement and the list of factors set forth in *Daubert*. *See Daubert*, 509 U.S. at 589; *see* Dkt. 426 at 14-15. As explained by the Supreme Court in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999), the list of factors in *Daubert* is not exclusive, and the test for reliability is "flexible."

In summary, Feit's assertions that basic testing such as photographs and spectroscopy are "not based in science or engineering and otherwise accepted in the lighting community" (Dkt. 426 at 14-16) are not supported, and contrary to both the opinions of its own expert and common sense. No new testing "methodology was developed for the purpose of this litigation" as Feit claims, and Feit has identified no purportedly new methodology. *Id.* Feit's broad allegations regarding scientific validity are unsupported attorney argument.

## IV.   CONCLUSION

For the foregoing reasons, Nichia requests that this Court deny Feit's motion to exclude portions of the expert testimony of Mr. Michael Gershowitz.

Respectfully submitted,

DATED: August 17, 2022          ROTHWELL, FIGG, ERNST &MANBECK P.C.
                                By: */s/ Robert P. Parker*

                                ROBERT P. PARKER (*pro hac vice*)


                                LEWITT, HACKMAN, SHAPIRO, MARSHALL
                                & HARLAN


                                By: */s/ Jeffrey A. Kobulnick*

                                JEFFREY A. KOBULNICK (SBN 228299)

                                *Attorneys for Plaintiff Nichia Corporation*